[Crim. No. 22504. Mar. 28, 1988.]

THE PEOPLE, Plaintiff and Respondent.
PHILLIP LOUIS LUCERO, Defendant and Appellant.

**COUNSEL**

Michael Satris, under appointment by the Supreme Court, Margaret Littlefied and Charles Bishop for Defendant and Appellant.

Melissa W. Johnson as Amicus Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John W. Carney and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BROUSSARD, J.**—This case arises on an automatic appeal from a judgment of death imposed under the 1978 death penalty law. (Pen. Code, §§ 190.1-190.4.)[1] Defendant, Phillip Louis Lucero, was convicted of two counts of first degree murder (§§ 187, 189) and one count of arson (§ 452, subd. (c)). A special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)) was found true.

Defendant presents numerous claims of error regarding jury selection, the guilt phase and the penalty phase of his trial. We have concluded that although the judgment of guilt must be affirmed, the death verdict must be reversed due to error in the exclusion of mitigating evidence. The cause is therefore remanded for a new penalty trial in accordance with the views expressed in this opinion.

### I.

#### GUILT PHASE EVIDENCE

On April 12, 1980, seven-year-old Chris Hubbard and ten-year-old Teddy Engliman were playing at the Hubbard home in the town of Yucaipa in

---

[1] All statutory references are to the Penal Code.

western San Bernardino County. Chris's father, Michael Hubbard, was working in the backyard garden. Sometime between 4 p.m. and 4:30 p.m. that afternoon, he gave the girls permission to go to the nearby I Street park to play on the swings.

At 4:30 or 4:45 p.m., Ruth Schultz heard defendant's goose cackling and looked out her dining room window. She saw two girls matching the description of Chris and Teddy standing at the back of defendant's lot between two fences. Defendant walked toward the girls and told them that the goose would not hurt them. The girls appeared to be coming into defendant's yard.

Shortly after 5:00, no more than 30 to 40 minutes after the girls had left for the park, Michael Hubbard became concerned by their failure to return. He and his wife made separate trips to the park but were unable to find the girls. About 5:30, Mrs. Hubbard called the San Bernardino County Sheriff's Department.

Sergeant Wallace Anton received a report of the missing girls from the sheriff's Yucaipa substation about 6 p.m. In order to coordinate the search, a temporary command post was set up at the I Street park almost directly across the street from defendant's house. Sergeant Anton assigned Deputies Charles Long and Hans Vander Veen to the search. Apparently at some point during the search one or more helicopters were employed.

About 7:15 p.m., Dolores Gwaltney heard defendant's car start up and drive down the street. She lived next door to defendant and was able to recognize the car because of its defective muffler. Ten minutes later she saw the car return to defendant's driveway. Three to five minutes later she saw defendant drive away in the car. Within minutes of the car's second departure, Mrs. Gwaltney saw a fire in the rear portion of defendant's house.

Deputy Long also noticed the fire as he reported to the search command post about 7:25 p.m. He radioed the California Department of Forestry and immediately began to fight the fire with a garden hose. He was joined shortly by Deputy Vander Veen and Sergeant Anton. Long and Vander Veen crawled into the burning house searching for anyone who might be inside. No one was found.

The Department of Forestry firefighters arrived at 7:37. Sergeant Anton immediately informed Fire Captain Charles Bryant of the missing girls and asked that the captain direct his men to search the burning house. Mrs. Gwaltney telephoned defendant at his parents' house. Defendant returned to the scene with his parents in their car.

When the fire was under control, the sheriff's officers returned to the command post across the street. The firefighters then alerted sheriff's deputies to a large blood stain on the carpet of defendant's living room. Several officers saw the bloodstain and questioned defendant.[2] The firefighters and deputies also noticed a bloodstained bedsheet and pieces of broken glass in the living room. About the time the deputies were examining the bloodstain, the bodies of the two girls were found in a nearby dumpster wrapped in green trash bags.

Subsequent searches by homicide detectives and sheriff's criminologists verified that the stained carpet and bedsheet contained human blood. The pieces of glass came from a broken Pepsi bottle found in the living room. Additional bloodstains were discovered on the gate to defendant's front yard. Teddy Engliman's brown tennis shoes were found in the living room. A rope was lying in a doorway between the front porch and the living room. Green trash bags were discovered in the kitchen. Gasoline residue was found on the living room carpet and in the bedroom, where the fire is believed to have originated.

Searches of defendant's car revealed blood stains on the exterior portion of the car trunk, on the driver's outside door handle, and in the interior of the car and trunk. There was a puddle of still moist blood on the bottom of the trunk compartment.

At the time of his arrest defendant's T-shirt was spotted with blood. The bottom of his left sock was saturated with blood. Dried blood was observed on one of defendant's hands.

The girls' bodies had been removed from the dumpster by 11 p.m. on April 12 and autopsies were performed the next day. The autopsy performed on Teddy Engliman revealed that several of the bones in her head had been fractured and that some of her teeth had been knocked out. The pathologist concluded that the injuries had been caused by a minimum of two or three blows from a blunt object. The immediate cause of death was aspiration of the blood produced by her injuries.

The autopsy of Chris Hubbard revealed an abrasion on her neck. The pathologist determined ligature strangulation to be the cause of death. He also concluded that the necklace Chris was wearing could have been used in the strangulation. Under magnification the doctor discovered "fine abrasions or little scrapes" within a discolored area on Chris's wrists. Although

---

[2] Defendant contends that the officers entered his home illegally during this initial investigation and thereby tainted all subsequent searches. The circumstances surrounding this investigation are described in the discussion of defendant's suppression-of-evidence claim.

he thought there could be other possibilities, the pathologist testified that the marks may indicate that the victim's wrists were tied together with some kind of rough twine or rope.

The doctor found no injuries which suggested the girls had been sexually molested. Tests of vaginal and anal swabs for traces of seminal fluid also proved negative.

When Teddy's body was removed from the trash bag numerous fragments of broken glass fell out. These fragments were later identified as coming from the same broken Pepsi bottle found in defendant's living room. The blood found on defendant's living room carpet, the bedsheet, the inner tube located in the trunk of his car and defendant's sock was tested and found to be of the same type as the blood taken from Teddy Engliman during the autopsy. (It did not match that of either Chris Hubbard or the defendant.) The plastic trash bags which had contained the bodies of the victims were found to be identical in color, thickness, size, packing folds and heat seals to the trash bags found in defendant's kitchen.

The minimal cross-examination conducted by defendant during the guilt phase focused on the impression of his emotional state formed by those having contact with him during the effort to extinguish the fire and immediately thereafter. All witnesses agreed that defendant appeared surprisingly indifferent and oddly subdued given the circumstances.

The defense called Deputy Ronald Durling as its only guilt phase witness.[3] Deputy Durling testified that defendant consented to the search of his house and car. Pursuant to a stipulation, the defense also read into evidence testimony which would have been given by defendant's wife had she been called as a witness. This testimony consisted of a statement that Mrs. Lucero left the house unexpectedly on the day of the murders and had no preexisting plan to be absent.

---

[3] Although the defense also called Sergeant Dennis O'Rourke of the San Bernardino Sheriff's Department, his testimony was stricken. The prosecution objected to defense counsel's questions about whether defendant had made any incriminating statements after waiving his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and reminded the court that it had precluded this line of inquiry by an earlier in-chambers ruling. The court agreed that the inquiry was improper and granted the prosecutor's motion to strike O'Rourke's testimony.

## II.

### Jury Selection Issues

*Exclusion of Prospective Jurors.*

■ Defendant challenges the trial court's exclusion of prospective juror Roy Van Hoy.

The trial court initiated the examination of prospective juror Van Hoy:

"COURT: Do you or anyone close to you have such a conscientious opinion regarding the death penalty that such an opinion would make it impossible for you to vote for the imposition of the death penalty in any case, under any circumstances, and regardless of the nature of the evidence introduced during the trial and penalty phase?

"VAN HOY: I'm afraid I'm going to have to say yes to that.

"COURT: Your personal feelings about the death penalty are such that you cannot conceive of any circumstances, any evidence, or any case under which you could possibly ever vote for the death penalty. Is that a correct statement?

"VAN HOY: So long as we have jails to put em in, no I could not.

"COURT: You could not?

"VAN HOY: No, I could not.

"COURT: It's a matter of conscience and you could never under any circumstance vote for the imposition of the death penalty?

"VAN HOY: I feel like it would just be the same as me killing the guy himself [*sic*].

"COURT: That's your —

"VAN HOY: That's my opinion.

"COURT: That's your conscientious opinion?

"VAN HOY: Yes, it is."

Although following this exchange defense counsel elicited testimony from Mr. Van Hoy that he could follow the law as given by the judge, upon reexamination by the court Mr. Van Hoy reiterated his position that he could not vote for the death penalty. We find no error on this record. Mr. Van Hoy repeatedly and unequivocally stated that under no circumstances could he vote for the death penalty in this case regardless of the evidence. (See *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770]; *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].)

III.

GUILT PHASE ISSUES

A. *Illegal Discovery of Evidence.*

 Defendant claims that several law enforcement officers entered his home illegally without a warrant. He maintains that these illegal entries led to the discovery of evidence later recovered from his house, car and clothing, and that this evidence should have been suppressed as the fruit of an illegal search. Respondent argues that the warrantless entries were justified because they occurred in connection with an arson investigation, and because of the exigency created by the missing girls.

As the firefighters were completing their "mopping up" operation at defendant's house, Captain Bryant and a second fireman discovered what appeared to be a large bloodstain on the living room carpet. Captain Bryant thought the bloodstain should be examined by law enforcement officers and sent for a deputy from the command post across the street. The first of the challenged entries occurred when Deputy Long and 16-year-old Explorer Scout Kenneth Rumple returned to view the blood stain. After looking at the stain, Long and Rumple quickly walked through the rest of the house. Long immediately radioed Sergeant Anton.

Sergeant Anton had been ordered to report to the neighborhood Safeway store. The body of one of the missing girls had been discovered in a green trash bag in a dumpster behind the store.[4] Anton received Long's radio call as he arrived at the store. He directed Long to secure the scene and immediately started for defendant's house. When he arrived the firefighters were completing their cleanup activities and were preparing to leave. Anton

---

[4] The body of the second victim was later found in the same dumpster, apparently after Sergeant Anton had already left the area to return to the defendant's house.

briefly examined the bloodstain and radioed the station to notify them of his find. Defendant also challenges Sergeant Anton's entry into his house.

■ Defendant concedes that fire and police officials may remain at the scene to investigate the causes of a fire once it has been extinguished, even though a warrant may be required to return to the property for subsequent investigations. (*Michigan* v. *Tyler* (1978) 436 U.S. 499, 510 [56 L.Ed.2d 486, 499, 98 S.Ct. 1942].) ■ He claims, however, that the officers were interested in evidence related to the missing girls and were not really conducting an arson investigation. We conclude, however, that the perceived danger to the missing children would still justify a warrantless entry and search.

■ A long-recognized exception to the warrant requirement exists when "exigent circumstances" make necessary the conduct of a warrantless search. " '[E]xigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], cert. den. *sub nom., California* v. *Ramey* (1976) 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335].)

■ We believe the search for the missing girls justified the officers' brief entries into the house. We must consider the facts as known to the officers. Two young girls are missing. A fire of unknown origin ignites in a house directly across the street from the park where the girls had gone to play. The girls, their bodies, or clues to their location might be somewhere in the burning house. Thus, when the firefighters first arrived at the scene, Sergeant Anton advised Captain Bryant of the missing children and asked him to order his men into the burning house with oxygen equipment to look for the girls.

The report of the bloodstain was another unusual circumstance adding weight to the suspicion that the house and the missing girls might be connected. The presence of blood also suggested that the children were in serious danger. At the time of Anton's entry the body of one of the girls had just been found, making it likely that the second girl was in imminent danger and making discovery of her location even more urgent.

Whether the officers were primarily interested in finding a lead to the missing girls or in investigating the fire is irrelevant. Either purpose would have justified their brief warrantless entries. In combination, these circum-

stances clearly created an emergency situation requiring swift action. We conclude that, based on the totality of the circumstances known to the officers at the time, Deputy Long, Explorer Scout Rumple and Sergeant Anton were justified in entering defendant's house without first seeking a warrant.

The later entry of Detective Swanlund presents a different situation. Swanlund was a homicide detective called after the first body had been found. He was not concerned with the arson investigation and had not been involved in the search for the missing girls. He was presumably interested in any evidence related to the murdered girl. When he arrived at the house the area had been secured and defendant was already at the sheriff's department substation.

Although no exigent circumstances justified Swanlund's warrantless entry, his observations were of no significance. Within 30 minutes of his arrival, homicide detectives and sheriff's criminologists arrived to conduct a full-scale search of defendant's house and car with defendant's consent. The consensual searches provided an independent basis to seize the challenged evidence. It should also be emphasized that Swanlund (or for that matter, Long, Rumple and Anton) did not testify at trial as to the observations he made during his brief entry into defendant's house. We conclude that the trial court properly denied defendant's suppression motion.

B. *Sufficiency of the Evidence of Premeditation and Deliberation.*

The only theory of first degree murder presented to the jury was that of premeditated murder. Although the trial court properly instructed the jury in this regard, defendant contends that the evidence presented at trial is insufficient as a matter of law to support a finding of premeditation.

 In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], we identified three categories of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation: (1) facts showing planning activity; (2) facts suggesting motive; and (3) facts about the manner of killing which suggest a preconceived design. Although the evidence presented at defendant's trial was not particularly strong on any one of the *Anderson* factors, the record reveals at least some evidence in each category. When considered in combination, and viewed in a light most favorable to the prosecution (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, 99 S.Ct. 2781]), this evidence is sufficient to support the jury's finding of premeditated murder.

The most substantial evidence of premeditation related to planning activity, "the most important prong of the *Anderson* test." (*People v. Alcala*

(1984) 36 Cal.3d 604, 627 [205 Cal.Rptr. 775, 685 P.2d 1126].) Defendant approached the children near the edge of his property and was heard to reassure them that they would not be harmed by his goose. The girls were seen entering defendant's yard and were killed inside his house. Since it is unlikely two young girls would have readily accompanied a man they did not know into a strange house, the jury could have reasonably inferred that defendant lured or compelled the victims to enter. The evidence also indicated that once inside the house defendant used a rope to bind the wrists of one girl, from which the jury could have inferred that defendant intended to immobilize one victim while he carried out his plan with respect to the other.

Defendant argues that his actions were not clearly "directed toward, and explicable as intended to result in, the killing. . . ." (*People* v. *Anderson, supra,* 70 Cal.2d at p. 26.) However, we have not always required that a murder plan be evident before characterizing conduct as planning activity. In *People* v. *Arcega* (1982) 32 Cal.3d 504 [186 Cal.Rptr. 94, 651 P.2d 338], for example, we found some evidence of planning where a neighbor testified that it was unusual for the defendant to have his curtains drawn. In this case, defendant's conduct prior to the killing appears much less ambiguous than the simple fact of drawn curtains relied on in *Arcega*.

The evidence of a motive for the murders is arguably the weakest element in *Anderson's* tripartite analysis. In *People* v. *Alcala, supra,* 36 Cal.3d at page 627, however, we found a "plausible motive" based on the fact that "defendant had committed a serious felony, kidnaping, on the victim and believed the victim to be the only person who could implicate him. '[H]ence he could [surmise] that by killing her . . ., he would eliminate the only [witness] to his [crime].' "

In this case defendant intercepted the girls from their innocent journey and brought them to his house. The evidence that the younger victim's wrists had been tied suggests additional mistreatment before the murders, which may have further escalated the consequences to defendant of letting his victims go free. As far as defendant knew, no one had ever seen him with the girls. The jury may have inferred that defendant killed them in order to avoid disclosure of his conduct.[5] It should also be noted that whatever the reason for killing the first victim, once this deed was done, defendant had a strong motive to eliminate the only witness to his crime.

---

[5] This analysis does not mean that defendant's conduct prior to the killings was necessarily directed toward some lesser criminal objective and thus not "planning activity" within the meaning of *Anderson, supra,* 70 Cal.3d at page 26. The jury could have believed that defendant planned to kill his victims from the outset.

The evidence indicated that Chris was strangled with the necklace she was wearing. While ligature strangulation may not always evidence a premeditated murder (see *People* v. *Rowland* (1982) 134 Cal.App.3d 1, 9 [184 Cal.Rptr. 346]), the jury could have viewed the strangulation as a deliberate manner of killing sufficient to indicate a "preconceived design." (The manner of Teddy's killing, multiple blows to the skull from a blunt object, is much less suggestive of premeditated murder.)

Although the evidence was far from overwhelming, we need not be convinced beyond a reasonable doubt that defendant premeditated the murders. The relevant inquiry on appeal is whether " '*any* rational trier of fact' " could have been so persuaded. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], quoting from *Jackson* v. *Virginia, supra,* 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573], italics original.) The steps taken by defendant prior to the killings, including securing the girls' presence in his house and binding the wrists of one, the possible motive of preventing disclosure of these deeds and anything else that may have occurred in the house that afternoon, and the ligature strangulation of Chris, provide sufficient evidence to support the jury's finding that the murders were premeditated and deliberate.

C. *"Sears/Anderson" Instruction.*

Defendant contends that under this court's decision in *People* v. *Sears* (1970) 2 Cal.3d 180 [84 Cal.Rptr. 711, 465 P.2d 847], the trial court committed reversible error by refusing to give the following requested instruction: "Evidence of premeditation and deliberation falls into three (3) basic categories: (1) Facts showing prior planning activity [¶] (2) Facts of prior activity suggesting motive [¶] (3) Facts about the manner of the killing which suggests a preconceived design. [¶] In order to sustain a first degree murder verdict there must be evidence of all three (3) types of facts or otherwise *extremely strong* evidence of prior planning (type 1) or evidence or [sic] motive (type 2) in conjunction with either prior planning (type 1) or manner of killing (type 3)."[6]

In *Sears* we held that a defendant has a right to instructions which direct the jury's attention to evidence which might engender a reasonable doubt, and to instructions which "relat[e] particular facts to any legal issue." (*Sears, supra,* 2 Cal.3d 180, 190.) Although acknowledging that his request-

---

[6] The court did give other instructions requested by the defendant which stated that the brutality of a killing alone was not sufficient to find premeditation and deliberation, that the law of premeditation and deliberation applied to multiple-victim murders as well as to murders with only one victim, and that evasive conduct after a homicide is not evidence of prior planning activity or that the murder was committed with premeditation and deliberation.

ed instruction did not direct the jury's attention to specific facts or evidence, defendant points to our observation that "a [*Sears*] instruction may, in appropriate circumstances, relate the reasonable doubt standard for proof of guilt to particular elements of the crime charged [citation] or may 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi." (*People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845].) As explained in a Court of Appeal decision: "What is pinpointed is not specific evidence as such, but the *theory* of the defendant's case. It is the specific evidence on which the theory of defense 'focuses' which is related to reasonable doubt." (*People* v. *Adrian* (1982) 135 Cal.App.3d 335, 338 [185 Cal.Rptr. 506], original italics.)

Defendant's requested instruction did not direct the jury's attention to particular facts which might create a reasonable doubt regarding premeditation and deliberation, nor did it relate the reasonable doubt standard to elements of the crime charged or to a theory of the defense. Instead, the proffered instruction quoted directly from *Anderson, supra,* 70 Cal.3d 26, to incorrectly suggest to the jury that it must find evidence of planning, motive and manner of killing in proper combination under one of the alternative *Anderson* formulae before it could find first degree murder. The *Anderson* factors, however, are not elements of the crime of first degree murder which the jury must find proven beyond a reasonable doubt before returning a guilty verdict. The *Anderson* court merely set forth a standard of appellate review by identifying the type of evidence that this court has found sufficient to sustain a finding of premeditation and deliberation. The trial court had correctly defined a deliberate and premeditated murder by giving CALJIC No. 8.20 (*People* v. *Goldbach* (1972) 27 Cal.App.3d 563, 569 [103 Cal.Rptr. 800]), and defendant's additional instruction on this issue was properly refused.

### D. *Spectator Outburst.*

■ Defendant contends that the trial court committed reversible error in denying his request for a mistrial after an emotional outburst by a courtroom spectator.[7]

During the guilt phase closing argument, defense counsel emphasized that for the extended period the girls were in defendant's house no screams or other unusual sounds were heard by neighbors. He suggested that this was especially significant given the fact that Chris may have been tied up,

---

[7]Emotions ran high throughout the trial. During the first jury selection, relatives of the victims were seen in the courtroom and corridors wearing badges which said, "Save Our Children." During the penalty phase the following statement was found printed in large letters on a stairwell wall in the courthouse: "Death to Lucero!!!"

and that one of the girls had to have witnessed the murder of the other. He also pointed out that there was no evidence that either girl had been gagged. Counsel argued that this evidence suggested that, rather than being premeditated, the killings occurred at the same time in an explosion of violence.

A short time later, as the jury was preparing to leave the courtroom to begin guilt phase deliberations, Teddy Engliman's mother cried out: "There was screaming from the ball park. They couldn't hear the girls because there was screaming from the ball park. That's why they couldn't hear it. The girls were screaming—screaming from the ball park, screaming, screaming, screaming. That wasn't in the case. Screaming, screaming from the ball park. Why wasn't that brought up? Why, why, why?"[8]

Mrs. Engliman was escorted from the courtroom by a number of people, including friends, relatives, the bailiff and the "[prisoner] escort officer." Even after she left the courtroom, her "screaming" could still be heard from the corridor. Several minutes after the outburst, "they [were] still tending to her just outside the courtroom." After the outburst, the court again directed the jurors to retire for deliberations, prefacing the order with a cursory admonition: "The jurors are admonished to disregard the outburst. The jurors, except for the alternate jurors, will go with the bailiff. The alternate jurors will remain here." The jury then left the courtroom. Defendant's in-chambers motion for mistrial was denied.

 Misconduct on the part of a spectator is a ground for mistrial if the misconduct is of such a character as to prejudice the defendant or influence the verdict. (*People* v. *Slocum* (1975) 52 Cal.App.3d 867, 884 [125 Cal.Rptr. 442], cert. den. *sub nom. Slocum* v. *California* (1976) 426 U.S. 924 [49 L.Ed.2d 379, 96 S.Ct. 2635].) A trial court is afforded broad discretion in determining whether the conduct of a spectator is prejudicial. (*Ibid.*)

 Defendant claims that three factors make the spectator misconduct particularly serious in this case. He notes that the outburst came at the worst possible time in terms of its prejudicial impact—just as the jury was preparing to leave the courtroom to begin deliberating on his guilt. Defendant additionally argues that this prejudicial impact was compounded by the fact that the outburst was not simply a display of emotion, but may have

---

[8] We have the actual transcription of the outburst thanks to an unflappable court reporter. In attempting to restate the outburst during the discussions on the motion for mistrial, both the trial court and the defense attorneys understood Mrs. Engliman to say that there was screaming in the park and why was that not brought out. The prosecutor, however, who would have been sitting closest to the jury, repeated the outburst virtually verbatim. It appeared that the court and defense attorneys had not understood the full significance of the outburst.

informed the jury of facts outside of the record. Finally, defendant maintains that we must be especially sensitive to the fact that the emotional outburst occurred in a capital trial. "[T]he presumption of prejudice from jury contact with inadmissible evidence is even stronger in the context of a capital case. 'It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated.' [Citation.]" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 848 [183 Cal.Rptr. 817, 647 P.2d 93] [judgment reversed because, among other errors, jury inadvertently learned during deliberations of defendant's refusal to take a lie detector test].)[9]

Although defendant cites four out-of-state cases which reverse because of spectator misconduct, none of these cases involved a single isolated outburst.[10] In *Rodriguez* v. *State* (Fla.App. 1983) 433 So.2d 1273, 1276, the victim's widow shouted epithets and interspersed her testimony with impassioned statements evidencing her hostility toward defendant. In *State* v. *Stewart* (1982) 278 S.C. 296 [295 S.E.2d 627, 629-631], certiorari denied 459 U.S. 828 [74 L.Ed.2d 65, 103 S.Ct. 64], the trial court failed to explore the prejudice which may have resulted from the conduct of a spectator who continually glared at the jury and who made opinionated remarks regarding defendant's guilt which were overheard by several jurors; an overcrowded and noisy courtroom also resulted in several outbursts requiring admonitions. In *Price* v. *State* (1979) 149 Ga.App. 397 [254 S.E.2d 512, 513-514], the victim's mother repeatedly disrupted the proceedings with emotional outbursts and other interruptions. Defendant's repeated requests for mistrial or to have the spectator removed from the courtroom were denied. *Walker* v. *State* (1974) 32 Ga.App. 476 [208 S.E.2d 350] found an abuse of discretion when the trial court allowed the mother of the victim to sit at the prosecution table throughout the trial over defendant's objection. We note two other cases: *State* v. *Gevrez* (1944) 61 Ariz. 296 [148 P.2d 829, 832-

---

[9] Although this is not a case where the misconduct created a *presumption* of prejudice, the gist of the *Hogan* quote remains applicable. A presumption of prejudice exists only in cases where the jury receives inadmissible evidence *after deliberations have begun,* either by intentional juror misconduct or by some inadvertent act. (See cases cited in *People* v. *Hogan, supra,* 31 Cal.3d 815, 846-847.) To the extent that Mrs. Engliman's outburst informed the jury of facts outside of the record, her misconduct is more analogous to cases where a jury hears inadmissible evidence because of improper argument by a prosecutor or through the improper testimony of a witness. In such cases prejudice is not presumed. Indeed, it is generally assumed that such errors are cured by admonition, unless the record demonstrates the misconduct resulted in a miscarriage of justice. (*People* v. *Green* (1980) 27 Cal.3d 1, 29 [164 Cal.Rptr. 1, 609 P.2d 468].)

[10] We have found no California cases which reverse a judgment because of spectator misconduct. (See *People* v. *Craig* (1978) 86 Cal.App.3d 905, 919-920 [150 Cal.Rptr. 676]; *People* v. *Slocum, supra,* 52 Cal.App.3d 867, 883-886, and cases cited therein.)

833], in which the mother of the deceased victim sat within three to four feet of the jury, repeatedly interrupted the trial with emotional outbursts, and wept bitterly throughout the trial; and *Glenn* v. *State* (1949) 205 Ga. 32 [52 S.E.2d 319, 321-322], in which the widow of the victim wept visibly and audibly during final argument after the prosecutor had asked her to be present to "let the jury know she was interested."

 The isolated outburst in this case was followed by a prompt admonition. For this reason, and because of the broad discretion afforded the trial court in cases of spectator misconduct, we find no abuse of discretion in the denial of defendant's motion for mistrial.[11]

## IV.

### PENALTY PHASE EVIDENCE

Defendant did not testify, but called several witnesses who described his character, background and family history. These witnesses included his father, mother, brother, sister, a childhood school mate and her husband, and a friend of his father.

The testimony shows that defendant's mother was 16 years old when he was born. His father had a serious drinking problem and was unable to provide even the bare necessities for his family. When defendant was four years old, his mother took her children and ran away to Texas with another man. Within a year his father discovered their location and forced his mother to give up the children.

Defendant's father initially took the children to live with him in Colorado; however, within two months defendant's siblings were sent to live with relatives. Defendant and his father remained together, living in a "shack" without electricity or running water. His father continued drinking heavily and paid little attention to defendant. Defendant's father eventually moved to California and left defendant with relatives. A short time later defendant was reunited with his father in California; however, his father continued to drink and defendant was essentially raised by relatives.

All witnesses agreed defendant has always been a withdrawn, passive and emotionally isolated individual. He also was described by several witnesses

---

[11] Although the court's cursory admonition was better than no admonition, under the circumstances of this case a greater effort should have been made to lessen the prejudicial impact of the misconduct. The court should have clearly admonished the jury not to consider facts outside of the record and not to be influenced by the emotional display. We of course recognize that such judgments are more easily made in retrospect and on the basis of a written record. It is possible the court did not appreciate the full significance of the outburst.

as a responsible young man, frequently babysitting for the daughter and son of family friends. There were never any problems with the care provided by defendant and both parents trusted him with their children. He has no criminal record and had never been in trouble with the police. He did not participate in the rowdy behavior—drinking and ransacking property—of his brother and his brother's friends. They "couldn't even draw him into going to get a drink. . . ."

At 16, a withdrawn and unhappy teenager, defendant lied about his age and, with his father's assistance, joined the army. Defendant completed three tours of combat in Vietnam. He received a Purple Heart and the Combat Infantry Badge, which is awarded to soldiers exceeding a specified amount of time in combat.

Defendant's psychological portrait was drawn by Dr. Edward Conolley. Defendant has serious psychological problems arising from his childhood experiences and his experiences in Vietnam. He suffers from severe emotional problems as a result of his difficult childhood. These emotional problems, combined with his young age and low-normal intelligence level, made him especially vulnerable to the stresses of combat. As a result of his combat experiences, defendant manifests definite symptoms of posttraumatic stress syndrome dating back to 1969. The doctor described these symptoms in detail: (1) reexperiencing two traumatic incidents in recurrent flashbacks; (2) emotional isolation and detachment both in Vietnam and in civilian life; (3) reenlistment and repeated volunteering for combat tours because of an inability to adjust to life outside of the combat zone; (4) sleep disturbance; (5) survivor guilt, focusing on a cousin killed in combat; (6) memory impairment and an inability to concentrate; and (7) avoidance of any activity or discussion which might arouse memories of Vietnam.

The doctor testified that in his opinion defendant was "quite psychologically impaired" on the day of the murders. He was unable to think clearly, to perceive reality or to react appropriately to that reality. Posttraumatic stress disorder played a significant role in defendant's psychological functioning and the conduct which ultimately led to the murders. In the doctor's opinion a set of circumstances occurred on the day of the murders which caused a flashback to a military setting and resulted in an explosive survival outburst.

The initial disruption was the departure of defendant's wife and child for an extended stay with her sister. Because of his troubled marriage, defendant interpreted his wife's unexpected departure as possibly signifying the end of his marriage. The next significant occurrence was the cackling goose. In Vietnam, agitated animals often signaled the approach of unfriendly

forces. The sound of helicopters searching for the missing girls and the use of loudspeakers to call their names could have been especially significant in triggering a flashback.

The prosecution called Dr. Jay Ziskin as its only penalty phase witness. Dr. Ziskin, a lawyer and licensed psychologist, testified broadly that psychological diagnoses are not valid or reliable.

## V.

### PENALTY PHASE ISSUES

A. *Exclusion of Evidence of Defendant's Future Behavior in Prison.*

Defense counsel asked Dr. Conolley if he had an opinion "as to whether or not Mr. Lucero is a recidivist?" The prosecutor objected, citing our decision in *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], certiorari denied *sub nom., Murtishaw* v. *California* (1982) 455 U.S. 922 [71 L.Ed.2d 464, 102 S.Ct. 1280]. The court took the matter under submission and directed counsel to pursue another line of inquiry. In later questioning counsel asked Dr. Conolley if he had an opinion "as to how Mr. Lucero would adjust in a structured setting like a prison for years down the road?" The prosecutor again objected on the same basis. The court sustained the objection and noted that it had decided to sustain the earlier objection as well.

 *People* v. *Murtishaw, supra,* 29 Cal.3d 733, does not support the judge's rulings. *Murtishaw* held the trial court committed reversible error in allowing the prosecution's expert to testify that defendant would commit violent and possibly homicidal acts while in prison. (29 Cal.3d at p. 775.) That holding was based largely on studies showing that predictions of future dangerousness are unreliable because they consistently overpredict violence. Such unreliability, we said, although tolerable in other contexts such as civil commitment, is unacceptable when the evidence is used as a basis for imposing a death penalty. (*Id.* at p. 771.) 
 These considerations do not apply when the prediction forecasts the absence of future violence, and is offered as a basis for a life sentence.[12]

The court's error in sustaining the prosecutor's objections, however, goes beyond questions of California evidentiary rules. The United States Supreme Court has expressly held that the sentencer must be permitted to

---

[12] If the defense introduces expert evidence that defendant will not be dangerous in the future, *Murtishaw* does not preclude the prosecution from offering expert evidence in rebuttal.

consider " 'any aspect of a defendant's character . . . that the defendant proffers as a basis for a sentence less than death.' " (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; quoting *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].) Evidence that a defendant's character is such that he would be unlikely to commit future crimes, and would adjust to prison life, clearly comes within this rule. Thus the trial court's rulings excluding relevant mitigating evidence violated the Eighth Amendment to the United States Constitution.

The United States Supreme Court decision in *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669] is directly in point. Skipper sought to introduce testimony of two jailers and one "regular visitor" to the jail to show that he had made a good adjustment to jail life; the trial court ruled the evidence irrelevant. The court described the question before it as "whether the exclusion from the sentencing hearing of the testimony petitioner proffered regarding his good behavior during the over seven months he spent in jail awaiting trial deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." (P. 4 [90 L.Ed.2d at p. 6, 106 S.Ct. at p. 1671].) It concluded that "[i]t can hardly be disputed that it did. . . . [The state does not dispute] that the jury could have drawn favorable inferences from this testimony regarding petitioner's character and his probable future conduct if sentenced to prison. Although it is true that any such inferences would not relate specifically to petitioner's culpability for the crime he committed [citation], there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.' *Lockett, supra,* at 604." (*Ibid.*)

After finding constitutional error, the court in *Skipper* reviewed the record and concluded that "it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence. Thus, under any standard, the exclusion of the evidence was sufficiently prejudicial to constitute reversible error." (*Supra,* 476 U.S. at p. 8 [90 L.Ed.2d at p. 9, 106 S.Ct. at p. 1673].)

The Attorney General seeks to distinguish *Skipper* on several theories. First, he points out that Skipper's witnesses, unlike Lucero's, did not expressly forecast future behavior, but recounted Skipper's past good behavior as a basis for inferring future behavior. The United States Supreme Court in *Skipper,* however, rejected a similar distinction as "elusive," and added that in any case a rule which would bar evidence offered "for the explicit purpose of convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars . . . would not pass muster under

*Eddings.*" (476 U.S. at p. 7 [90 L.Ed.2d at p. 8, 106 S.Ct. at p. 1672].) Lucero has offered evidence to show that he would not commit further crimes, and could make a good adjustment to prison life—an offer which conforms exactly to the quoted language in *Skipper*.

Second, the Attorney General argues that in *Skipper, supra,* 476 U.S. 1, the prosecution, pointing to Skipper's past record of sexual assaults, claimed that Skipper would be a danger to other inmates. Thus, he concludes, in *Skipper,* unlike the present case, future prison behavior was a contested issue. But the argument cuts both ways. Because of Lucero's lack of prior violent conduct, the predictions of his good behavior in prison would be far more credible than Skipper's. Lucero's background, his conduct in custody, and Dr. Conolley's testimony that the murders were a response to a specific mental disorder which could be controlled in a structured setting with therapy, all indicate that defendant would not be a danger in a prison setting.[13] Defendant was entitled to establish this point as an important consideration in mitigation.

Finally, the rulings below are not rendered harmless by the fact that Dr. Conolley was permitted to testify to Lucero's past behavior in prison and current mental condition, testimony from which a juror could infer that Lucero probably would not commit further crimes.[14] *Valle* v. *State of Florida* (Fla. 1987) 502 So.2d 1225 considered a similar issue. In that case the trial court admitted testimony from two prison officers that defendant was a model prisoner, but excluded testimony of psychologists concerning his future behavior. Before *Skipper, supra,* 476 U.S. 1, the Florida Supreme Court had held the exclusion harmless, reasoning that the expert testimony was cumulative since one could infer good future behavior from past behavior. (*Valle* v. *State of Florida* (Fla. 1985) 474 So. 2d 796, 801.) The United States Supreme Court granted certiorari and remanded, citing *Skipper.* (*Valle* v. *Florida* (1986) 476 U.S. 1102 [90 L.Ed.2d 353, 106 S.Ct. 1943].)

---

[13] It is interesting to note the trial judge's own out-of-court observations regarding defendant's dangerousness and ability to adjust to a custodial setting. In a context unrelated to the present issue the court stated: "In this case I concur that Mr. Lucero is not a danger to any other human being insofar as I can determine. I have had occasion since, I think April of last year, spent untold hours in Mr. Lucero's presence frequently without any other person being present and at no time was I ever in any way nervous or did I feel that I was in the least threatened. Mr. Lucero was only a danger to two specific little girls and to no other human being, insofar as I am aware." In yet another context the court observed: "This is the least obvious of the custody cases I've ever seen. Everybody is so fond of Mr. Lucero that they simply —there's no way that anybody would ever know that he's in custody. It is the loosest custody I have ever seen."

[14] Conolley testified that Lucero was a "kind of 'a model prisoner' in that he basically keeps to himself at all times, spends all of his time reading or writing some letters or whatever. So in a general sense his adjustment has been fine." He added that Lucero's mental disease could be controlled with therapy in a structured setting.

The Florida court then reversed its decision. "We are now persuaded that the excluded evidence of these experts differed in quality and substance from that of the rehabilitation officer. The expert testimony was proffered in proof of the probability that [defendant] would be a model prisoner in the future. It cannot be said that this evidence was cumulative in light of the rehabilitation officer's testimony that he could only vouch for [defendant's] behavior while previously imprisoned and that he had no opinion as to [defendant's] ability to adjust, in the future, to prison life." (*Valle* v. *State of Florida, supra,* 502 So.2d at p. 1226.) Relying solely on the exclusion of expert testimony concerning future behavior, the Florida Supreme Court reversed the death penalty.

We agree with the *Valle* analysis: there is a significant difference between an inference which a juror may or may not draw and a direct expression of expert opinion. The expert's authority and experience may persuade the jurors to a conclusion they would not reach on their own.

B. *Exclusion of Testimony Relating to Posttraumatic Stress Syndrome.*

Defendant also offered the testimony of Thomas Wulbrecht, a Vietnam veteran with various degrees in psychology and social work. Wulbrecht is currently director of a "program of readjustment counseling" for Vietnam veterans at Pettis Veterans Hospital in Southern California. He has specialized training in the diagnosis and treatment of posttraumatic stress syndrome, particularly in Vietnam veterans. Based on a three-and-one-half-hour examination of defendant, Wulbrecht was prepared to testify that Lucero suffered from strong symptoms of this disorder dating back to 1969. Wulbrecht did not discuss with Lucero the circumstances of the murders. When asked if certain circumstances occurring on the day of the killings could have precipitated the violence, Wulbrecht opined that it was "probable" that the delayed stress disorder caused defendant to commit the murders.

The prosecutor objected to the proffered testimony on the ground that it was not relevant to any of the statutory factors since it did not relate to the circumstances of the crime. He argued that Wulbrecht had not discussed the murders with Lucero and could not say with certainty that the mental condition precipitated the killings. Defense counsel responded that Lucero's mental condition was relevant as mitigating evidence since "the whole person, is in issue in these proceedings. . . . This had nothing to do with the commission of the crime. It has to do with the totality of the personality of this individual."

The court rejected the defense argument and ruled that the testimony was inadmissible unless the witness "relates it in some way to the commission of the offense, even though it is a part of the whole person." Because the court seemed particularly concerned about Wulbrecht's proposed testimony that the stress syndrome may have precipitated the killings, defense counsel offered to limit the testimony to the nature of defendant's disorder "as a factor in mitigation." The court rejected the offering, citing its earlier ruling that the testimony could not be admitted "unless the mental condition can be shown by expert testimony to be related to the offense."

The court described its ruling for the record: "[F]or the record . . . I would like to point out that the basis of my ruling is not that this witness is not qualified to testify that Mr. Lucero suffers from post-traumatic stress syndrome. I have previously ruled that he is qualified to render that opinion. What I am ruling is that the opinion, standing alone, is not relevant to the issues which are to be presented to the jury in these proceedings. I am ruling that it does not relate by sheer speculation to the activities of that day. [¶] This witness has candidly testified that without additional information he cannot render an opinion as to whether or not the traumatic stress syndrome, in his opinion, which in his opinion Mr. Lucero suffers from, was a factor in the deaths of the little girls."

■ The theory of the prosecutor's objection and the reasoning of the court in sustaining that objection were clearly inconsistent with the United States Supreme Court's decisions in *Lockett* v. *Ohio, supra,* 438 U.S. 586, *Eddings* v. *Oklahoma, supra,* 455 U.S. 104, and *Skipper* v. *South Carolina, supra,* 476 U.S. 1, as well as the analogous authority of this court. Defendant was entitled to have the jury consider his psychological disorder as a factor in mitigation whether or not the mental condition caused him to commit the crimes. Even assuming the court could have properly excluded an opinion by Wulbrecht with regard to the probability that the disorder precipitated the killings, the court should have at a minimum accepted defendant's offer to limit that testimony to a description of his mental condition.

We cannot uphold exclusion of Wulbrecht's testimony as merely cumulative of Conolley's, nor rely on that argument to consider the exclusion harmless. First, there is, as the prosecution evidence demonstrated, considerable debate about whether the Vietnam posttraumatic stress syndrome does in fact exist; in this setting, it could be argued that evidence from a second expert on the existence of the syndrome should not be deemed cumulative. Second, a similar point can be made about the defense claim that, assuming such a syndrome exists, it is possible reliably to diagnose a given person as suffering from the syndrome. As the prosecution suggested,

there is considerable debate about the system by which a person is judged by any given examiner as meeting the "profile" of the syndrome; thus, it could be argued that evidence from a second expert to the effect that defendant meets the profile of one suffering from the syndrome, should not be deemed cumulative. Third, Wulbrecht's proffered testimony may have been especially important in light of the People's theory that Conolley's diagnosis could not be trusted because he was a mere "hired gun" who would testify to whatever the defense wished. Under this circumstance, it might have been very important for defendant to be able to show that not only one, but *two* mental health experts had diagnosed him as suffering from the stress syndrome. Additionally, whereas the People were able to question Conolley's diagnosis by impugning the entire psychiatric profession as unprincipled, and willing to testify for any defendant with money, Wulbrecht was a different sort of witness: He had no such "professional" interest in the testimony. Instead, he was a Vietnam veteran who went back to school after the war to help his fellow veterans, and he worked day-to-day with veterans suffering from the stress syndrome.[15]

### C. *Prejudicial Effect of the Erroneous Exclusion of Mitigating Evidence.*

 As we have noted, error which results in the exclusion of potentially mitigating evidence is federal constitutional error. (*Ante,* pp. 1026-1027.) To date, cases finding an unconstitutional exclusion of evidence have reversed without discussing a test of prejudice. (See *Skipper* v. *South Carolina,*

---

[15] We note two instances of misleading argument by the prosecutor. First, he argued that the violent character of the charged crimes could be considered under both section 190.3, factor (a)—the circumstances of the crime—and factor (b)—crimes of violence. We have since held that factor (b) applies only to crimes other than the charged crimes. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Kimble* (1988) 44 Cal.3d 480, 505 [244 Cal.Rptr. 148, 749 P.2d 803].) Since defendant had no prior criminal record, the prosecutor's misleading argument not only involved double use of the circumstances of the present offense as an aggravating factor, but also the improper elimination of a legitimate mitigating factor. Second, the prosecutor also argued that the absence of evidence relating to other mitigating factors (factors (e), (f), and (g)) rendered those factors aggravating, an argument inconsistent with our opinions in *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861] and *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 789.

Because this case was tried before *Miranda* and *Davenport,* we do not describe the prosecutor's mistaken argument as misconduct. For the same reason, we could not treat a defense counsel's failure to object as incompetence or waiver. Our concern is not with the ethics of the prosecutor or the performance of the defense, but with the impact of the erroneous interpretation of the law on the jury. The evidence in the present case actually showed a single aggravating factor —the circumstances of the crime—and substantial mitigating considerations. The prosecutor's argument turned the case upside down, leaving the defendant with a single mitigating factor—the absence of prior felony convictions—as against eight aggravating factors. The jury thus was left with the misleading impression that the law considered this a particularly egregious case, and defendant more deserving of death than other murderers.

*supra,* 476 U.S. 1; *Eddings* v. *Oklahoma, supra,* 455 U.S. 104; *Lockett* v. *Ohio, supra,* 438 U.S. 536.) In *Hitchcock* v. *Dugger* (1987) 481 U.S. 393, 399 [95 L.Ed.2d 347, 353, 107 S.Ct. 1821, 1824], however, the United States Supreme Court considered a closely related question—jury instructions barring consideration of relevant mitigating evidence—and suggested that a harmless error test might apply in such cases. ▮▮ *Hitchcock* did not specify the appropriate test of prejudice, but we presume that the test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], the test which generally governs federal constitutional error, is what the court had in mind.[16] Under that test, error is reversible unless the state proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (386 U.S. at p. 24 [17 L.Ed.2d at p. 710].)

Under the *Chapman* test, and a fortiori under any more exacting standard, the exclusion of mitigating evidence in the case before us would require reversal of the penalty verdict. This case is one in which the jury might have found the death penalty inappropriate. Defendant offered a substantial showing in mitigation: the absence of any prior acts of criminal violence, the absence of any prior felony convictions, a deprived and harrowing childhood, a traumatic military experience, and a serious mental illness. In contrast, the prosecution presented no affirmative evidence in aggravation at the penalty trial. ▮▮▮▮ We therefore find a reasonable doubt whether the jury, had they heard the excluded mitigating testimony of Conolley and Wulbrecht, would have returned a death verdict.[17]

The judgment as to guilt, and the finding of special circumstances, are affirmed. The judgment of death is reversed, and the cause remanded for a new penalty trial consistent with the views expressed in this opinion.

---

[16]The Attorney General has argued that in Eighth Amendment cases the federal test of prejudice for constitutional error is not *Chapman,* but equivalent to our *Watson* test, under which a court may reverse only if it is of the opinion "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].) He relies on *Strickland* v. *Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]. That case, however, was not concerned with establishing a test of prejudicial error, but with defining incompetency of counsel. It concluded that to prove incompetency, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (P. 694 [80 L.Ed.2d p. 698].) (We use an identical test for assessing incompetency of counsel. See *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].)

[17]Having concluded that errors excluding mitigating evidence require reversal, it is not necessary for us to determine whether the misleading arguments relating to aggravating and mitigating factors would also require reversal of the death verdict.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

MOSK, J.—Phillip Louis Lucero never had a brush with the law. He was industrious and family oriented, despite a childhood environment that was far from exemplary. Then we taught Phillip Louis Lucero to kill, and sent him to war. As his patriotic duty, he killed our enemies efficiently. Unfortunately, after returning home he irrationally killed again, this time two innocent children. There is macabre irony in the fact that the society on whose behalf Lucero took an undetermined number of lives is now seeking to take his life.

In the early days of this republic, Justice Johnson of the United States Supreme Court cautioned that "War strips man of his social nature; it demands of him the suppression of those sympathies which claim man for a brother; and accustoms the ear of humanity to hear with indifference, perhaps exultation, 'that [human beings] have been slain.' " (*The Rapid* (1814) 12 U.S. (8 Cranch) 155, 161 [3 L.Ed. 520, 522].) And after the Second World War Justice Murphy of the high court reminded us that "War breeds atrocities. From the earliest conflicts of recorded history to the global struggles of modern times inhumanities, lust and pillage have been the inevitable by-products of man's resort to force and arms." (*In re Yamashita* (1946) 327 U.S. 1, 29 [90 L.Ed. 499, 517, 66 S.Ct. 340] (dis. opn.).)

Lucero spent seven and a half years in the army, beginning at the age of sixteen. Much of that service was in combat in Vietnam, for which he was awarded the Combat Infantry Badge and a Purple Heart. The record shows that his combat duty was performed effectively. He was promoted to E-4 rank (corporal), and despite one disciplinary reproval, was ultimately promoted to E-5 rank and won a Unit Citation Award. He completed three tours of duty in Vietnam, and was into his fourth tour when he left the army.

According to the evidence, Lucero suffered two particularly traumatic war experiences that now haunt him day and night as "intrusive recollections." In the first incident he encountered a Vietnamese dressed in civilian clothes and holding a grenade; fearing attack, he shot and killed the man, only to discover later that his victim was a friendly soldier out of uniform. In the other incident he retrieved rotting corpses from the battlefield, some of which were actually falling apart from decomposition.

According to the examining forensic psychologist, Lucero thereafter exhibited classic symptoms of post-traumatic stress disorder based on his combat experiences in Vietnam. The honking of the goose brought back

haunting memories, since in Vietnam the cries of animals were frequently a sign of imminent danger. The use of helicopters in the police search for the missing girls may have tripped a combat flashback and caused him to lose control and revert to a struggle to survive in a battlefield environment.

We will never know precisely what impelled a tormented mind to act. We do know that the killings were utterly incomprehensible. No sexual acts were involved, nor were the other common motivations for murder: robbery, kidnapping, personal animus.

I concede as a general proposition that the law cannot countenance domestic violence by Vietnam veterans, even though many unfortunately still suffer from their agonizing experiences.

I do believe, however, that this defendant deserves compassion from a society that in the first instance taught him to kill. His conviction of murder in the first degree should be upheld, but he does not deserve death at the hands of the society he faithfully served.

On three occasions over the past years I have urged my colleagues to employ the statutory powers vested in this court to reduce a sentence. (*People* v. *Mabry* (1969) 71 Cal.2d 430, 446-458 [78 Cal.Rptr. 655, 455 P.2d 759] (dis. opns. by Mosk, J. and Peters, J.); *People* v. *Holt* (1984) 37 Cal.3d 436, 462 [208 Cal.Rptr. 547, 690 P.2d 1207] (dis. opn. of Mosk, J.); *People* v. *Coleman* (1985) 38 Cal.3d 69, 98 [211 Cal.Rptr. 102, 695 P.2d 189] (dis. opn. of Mosk, J.).) This is a particularly appealing case for such action.

The offense was heinous, there is sufficient evidence for conviction, and the judgment of guilt is properly affirmed by the majority. I also agree that there were prejudicial errors in the penalty phase. Thus the issue is whether this defendant deserves a potential death sentence after retrial of the penalty phase ordered by the majority.

This crime took place in July 1980, nearly eight years ago. The evidence has undoubtedly grown stale and memories of witnesses have become dim. A retrial of any aspect of a case this old may be difficult, perhaps futile, presenting impossible demands on the administration of justice.

Therefore, to serve the ends of justice, I would exercise our statutory authority not to require retrial of the penalty phase but to reduce the judgment to a conviction of first degree murder without special circumstances and to remand for resentencing.

The authority of this court to reduce a judgment in a criminal case is contained in Penal Code section 1260, which provides that on appeal the

reviewing court may "reverse, affirm, or *modify* a judgment or order appealed from, or *reduce* . . . the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may . . . remand the cause to the trial court for such further proceedings as may be just under the circumstances." (Italics added.) (See, e.g., *People* v. *Schueren* (1973) 10 Cal.3d 553, 561-562 [111 Cal.Rptr. 129, 516 P.2d 833]; also *People* v. *Odle* (1951) 37 Cal.2d 52, 57 [230 P.2d 345], which declares Pen. Code, § 1260 may be employed when there is an error in the penalty phase, as the majority find here. For other examples of the use of this statutory power, see *People* v. *Ketchel* (1969) 71 Cal.2d 635, 639, fn. 2 [79 Cal.Rptr. 92, 456 P.2d 660]; *People* v. *Enriquez* (1967) 65 Cal.2d 746, 749 [56 Cal.Rptr. 334, 423 P.2d 262]; *People* v. *Jerome* (1984) 160 Cal.App.3d 1087, 1097, fn. 6 [207 Cal.Rptr. 199]; *People* v. *Alexander* (1983) 140 Cal.App.3d 647, 666 [189 Cal.Rptr. 906]; *People* v. *Dozie* (1964) 224 Cal.App.2d 474, 477 [36 Cal.Rptr. 728]; *People* v. *Fernandez* (1963) 222 Cal.App.2d 760, 770 [35 Cal.Rptr. 370].)

There is also authority vested in appellate courts by Penal Code section 1181, subdivision 7. It provides that a trial court may modify a verdict "by imposing the lesser punishment without granting or ordering a new trial, and *this power shall extend to any court to which the case may be appealed*." (Italics added.)

In *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898], this court found serious errors and misconduct committed by the trial court and the prosecutor, but since the overwhelming weight of credible evidence established guilt, the judgment was reversed with directions to reduce a death penalty to life imprisonment. The majority relied on the miscarriage of justice section of the California Constitution (then § 4½, now § 13, of art. VI).

In a number of cases our predecessors on this court have avoided exercise of the statutory power clearly given us by section 1260, but they have never provided a convincing rationale for doing so; rather they appear to have adopted a convenient summary rejection of that responsibility. (See, e.g., *People* v. *Howk* (1961) 56 Cal.2d 687, 700 [16 Cal.Rptr. 370, 365 P.2d 426]; *People* v. *Linden* (1959) 52 Cal.2d 1, 26 [338 P.2d 397]; *People* v. *Green* (1956) 47 Cal.2d 209, 235 [302 P.2d 307]; *People* v. *Carmen* (1954) 43 Cal.2d 342, 351 [273 P.2d 521]; *People* v. *Dessauer* (1952) 38 Cal.2d 547, 555 [241 P.2d 238]; *People* v. *Thomas* (1951) 37 Cal.2d 74, 77-78 [230 P.2d 351].) Consistent with our explicit statutory power, I would overrule the portions of the foregoing decisions that declare this court may not reduce the punishment imposed in a criminal case.

There has been similar unexplained reluctance in the past to use Penal Code section 1181, subdivision 7. Despite the fact that this court had relied on that section in *People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 414 [303 P.2d 1018], and *People* v. *Howard* (1930) 211 Cal. 322, 330 [295 P. 333, 71 A.L.R. 1385], the opinion in *People* v. *Lookadoo* (1967) 66 Cal.2d 307, 327 [57 Cal.Rptr. 608, 425 P.2d 208], inexplicably declared that only the trial court, not this court, may reduce punishment. *Lookadoo* relied on *People* v. *Mitchell* (1966) 63 Cal.2d 805, 821 [48 Cal.Rptr. 371, 409 P.2d 211]. In neither opinion, however, was there any discussion other than the conclusory statement in *Mitchell* that "This court has uniformly rejected requests to reduce the penalty from death to life imprisonment." (*Ibid.*) There was no suggestion that the court lacked the power to so act. I would overrule the portions of *Lookadoo* and *Mitchell* that declare this court may not reduce the punishment imposed in a criminal case.

For these reasons I would modify the judgment to eliminate the special circumstances and the death penalty, affirm as modified, and remand for resentencing.

Appellant's petition for a rehearing was denied May 5, 1988. Mosk, J., was of the opinion that the petition should be granted.