Filed 2/11/16  P. v. Parra CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B258537 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA090527) |
| v. | |
| GUILLERMO PARRA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard R. Romero, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Blythe J. Leszkay and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Guillermo Parra appeals a judgment following a jury trial at which he was convicted of second degree murder. He contends his conviction must be reversed because the trial court made two erroneous evidentiary rulings, and because his right to a fair trial was violated by the conduct of a courtroom spectator. We affirm the judgment.

**FACTS**

On October 11, 2011, at approximately 8:00 p.m., Cecilia S. and Antwan Johnson (the murder victim) were walking home on Chestnut Street in the City of Long Beach when Ms. S. heard a male voice behind them ask, "Where are you from?" Ms. S. did not know whether the person was talking to her and Johnson. When she and Johnson turned around to see what was happening, Ms. S. saw Parra and two other Latino men standing on either side of him. Parra asked, "Where are you from?" and Ms. S. replied, "Oh wait a minute. Like, leave us alone. He's not in a gang." The three men walked toward Ms. S. and Johnson, while she again stated, "Leave us alone." The three men then surrounded Johnson and started punching him as he tried to defend himself. The scuffle quickly stopped. As the men walked away, Para said, "We don't like niggers in our hood. Stay the fuck out our hood."

When Ms. S. went to check on Johnson, he looked "off balance, like he didn't recognize [her]," and she heard someone yell out, "I think his shirt is wet." Ms. S. lifted up Johnson's shirt and saw that he had been stabbed.

Johnson died from a stab wound caused by a knife that entered the middle of his abdomen, went through the liver, entered the gallbladder, and then in a downward and medial trajectory, injuring the small intestine, portions of the colon, and causing an incision on the aorta and the inferior vena cava.

Olga G. worked at the Cafecito Salvadoreno restaurant on Anaheim Street in Long Beach. She saw an African-American man and woman walk by the restaurant followed by three Latino men. Ms. G. had seen the three men on other days in the restaurant and loitering around the outside of the restaurant. Ms. G. recognized one of the three men as Parra. A few seconds after the African-American couple and the three Latino men walked by the restaurant, Ms. G. heard a woman screaming. When she looked outside

2

the restaurant, Ms. G. saw the same African-American couple that had just walked by, but the man was now bending over, holding his stomach.

Long Beach Police Department Detective Hugo Cortes investigated Johnson's murder. The area around the murder was "very well lit" by street lights and store front lighting. Detective Cortes showed Ms. G. a six-pack photographic lineup, and she identified Parra's photograph as one of the three Hispanic men she had seen in the area at the time of the stabbing.

Parra has tattoos of the words "Long Beach," a playboy bunny, and the grim reaper on his back. He also has a "LB" tattoo on his lower left leg and three dots on his left hand. Around the area of the stabbing there was a lot of graffiti belonging to East Side Longos, including the words "Fuck Niggers." Long Beach Police Department Officers Martin Ron, Kalod Abuhadwan, and Dider Reyes all had prior contacts with Parra. He admitted that his moniker was "Frost," and that he was a member of the East Side Longo gang.

In July 2012, the People filed an information charging Parra with murder. (Pen. Code, § 187, subd. (a).)[1] Further, the information further alleged that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that Parra had suffered a prior conviction in 2010 for robbery which qualified both as a strike conviction (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)) and as a prior serious felony (§ 667, subd. (a)).

The case was tried to a jury, at which time the prosecution presented evidence of the facts summarized above. Ms. S. and Ms. G. identified Parra in court. A gang expert testified that the primary rival of the East Side Longo gang is the Insane Crip gang, an African-American gang, and that the East Side Longo "has had a racial offense against Asian Americans as well as African Americans within the City of Long Beach." Further, the expert testified that a crime of the nature of the Johnson murder would have been committed for the benefit of the Longo gang.

---

[1]     All further undesignated section references are to the Penal Code.

Parra called an expert on eyewitness identifications who explained the factors that affect the accuracy of such identifications. Parra also testified on his own behalf. He denied being a gang member, denied ever telling any police officer that he was a gang member, and denied being involved in any part of the events surrounding Johnson's murder.

The jury returned a verdict convicting Parra guilty of second degree murder, and found the gang allegation to be true. Parra subsequently admitted the prior strike allegation. The trial court sentenced Parra to an aggregate term of 35 years to life as follows: 15 years to life for the murder, doubled for the prior strike, plus an additional five year term for the prior serious felony conviction.

## DISCUSSION

### I. Scope of Expert Testimony

Parra contends his murder conviction must be reversed because the trial court erred in limiting the testimony of his expert on eyewitness identifications. Specifically, Parra argues the court erred in ruling that his expert could not testify about "real life instances where eyewitness testimony which led to a conviction was later found to be inaccurate due to DNA or third party confessions." He argues the limitation on the scope of his expert's testimony violated his due process right to present a defense. We disagree.

*The Trial Setting*

Parra called Ralph Haber, Ph.D., to testify as a defense expert on the subject of eyewitness identifications. After a series of opening questions establishing Dr. Haber's qualifications as an expert in the area of eyewitness identifications, Parra's trial counsel opened the substantive aspect of his questioning with the following exchange:

> "Q: Is there evidence as in has there been research in the general area whether eyewitnesses makes make mistakes when they identify someone?
>
> "A: Yes. There is a substantial amount of evidence that that occurs."

4

Parra's counsel immediately followed with this question: "And is there some *real crime data* dealing with mistakes that eyewitnesses make?" (Emphasis added.) At this point, the prosecutor objected on the ground that the inquiry sought information "beyond the scope of [Dr. Haber's] expertise." The trial court sustained the prosecutor's objection.

Parra's counsel then asked: "Has there been research regarding erroneous identification by eyewitnesses discovered post-conviction?" The prosecutor again objected as "[b]eyond the scope." At this point, the trial court asked the lawyers to approach for a sidebar discussion.

At a sidebar conference, the trial court commented that "[n]ormally, an expert can testify to any clinical trials that show people made mistakes, but when you start going into the legal system and say that some eyewitnesses called in an actual trial made a mistake, then I have some issues." The prosecution argued that it would be improper for Dr. Haber to testify that a conviction in a specific case had been overturned. Parra's counsel countered that it was within the scope of Dr. Haber's expertise to discuss examples of specific cases. For example, rape cases where DNA testing after trial had proven that a defendant convicted by eyewitness identification was not the perpetrator of a crime. Parra's counsel proffered that such examples would corroborate the defense expert's testimony about the research work on the factors that affect eyewitness identifications. As stated by Parra's counsel: "[T]he research is that eyewitnesses make mistakes. Those are incidents that corroborate that. . . . [¶] . . . The research is showing that this happens in clinical situations, and these instances show that it's happened, in fact, in real life."

At the conclusion of the sidebar conference, the trial court confirmed its ruling that Dr. Haber could not refer to specific cases in his testimony. When Parra's counsel asked about matters as to which he was permitted to inquire, the court agreed to let the jurors go on a short break, and then conducted a hearing pursuant to Evidence Code section 402. During the 402 hearing, Dr. Haber testified that he was aware of "about 300 eyewitness cases in which a man was convicted of sexual assault, convicted in court, sent to prison,

5

and subsequently it was discovered that somebody else had committed the sexual assault, usually based on DNA evidence." Dr. Haber testified that, of those 300 cases, the evidence used to convict the defendant in 225 of the cases was eyewitness testimony. The court expressed concern as to the "anecdotal" nature of such testimony, as opposed to scientific research, and, again, ruled the evidence inadmissible.

Parra's counsel proffered that Dr. Haber had knowledge about "a specific . . . study that was done by the U.S. Army" into "instances" in which "you have these convictions that are based on eyewitness identifications, and then later it's shown that the eyewitness was wrong." Counsel asked whether an inquiry into this study was within the court's ruling, and the court requested a "specific proffer." Parra's counsel then explained:

> "The specific proffer is that the research into those actual studies documents the principles of eyewitness identification, namely some of the factors that affect the accuracy and the inaccuracy of eyewitness identification, that, [A], we have the laboratory, we have the classroom, the office where research is done, [and B], we have the real world. In the laboratory and classroom we get principles, and we can see in the real world where these principles are applied, that these beliefs and conclusions are true."

The trial court ruled the evidence inadmissible. When Parra's counsel continued to argue the issue, the court responded that it took the argument "as a motion for mistrial," and denied the motion.

The jury was brought back into the courtroom and Dr. Haber resumed testifying. In the course of his ensuing testimony, Dr. Haber explained that there had been several research studies into the variables that affect the accuracy of eyewitness identifications. For example, the amount of lighting at an incident, the distance between the eyewitness and the identified person, the cross-racial nature of the identification, the extent to which the eyewitness was fearful and under stress, the number of persons involved in an incident, and whether the eyewitness identified a "stranger" as opposed to a person whom

6

the witness knew from past contacts. Dr. Haber testified that a number of such variables were present in connection with Cecilia S.'s identification of Parra, such as a night-time incident, fear and stress, and that multiple perpetrators were involved.

*Analysis*

Generally, a trial court is vested with wide discretion to admit or exclude expert testimony, and a reviewing court may not interfere with the exercise of that discretion unless it is clearly abused. (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512.) As to the issue of expert testimony on eyewitness identifications, the leading case is *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*), overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.). In *McDonald*, the Supreme Court ruled that the exclusion of such expert testimony "in wholesale fashion" constituted an abuse of the trial court's discretion. (*Id*. at p. 372.)

In coming to this conclusion, the Supreme Court applied the general rules of Evidence Code section 801, subdivision (a), noting that expert testimony on subjects beyond the range of jurors' common experience is admissible where it would assist jurors decide a particular case. (*McDonald, supra*, 37 Cal.3d at p. 367.) The court further stated: "It is doubtless true that from personal experience and intuition *all jurors know that an eyewitness identification can be mistaken*, and also know the more obvious factors that can affect its accuracy, such as lighting, distance, and duration. It appears from the professional literature, however, that other factors bearing on eyewitness identification may be known only to some jurors, or may be imperfectly understood by many, or may be contrary to the intuitive beliefs of most." (*Id*. at pp. 367-368; emphasis added; fn. omitted.)

Thus, the court determined that it may be an abuse of discretion to exclude the testimony of a psychologist who is a qualified expert witness "*on specific psychological factors shown by the record that could have affected the accuracy of [an eyewitness] identification but are not likely to be fully known or understood by the jury . . . .*" (*Id*. at p. 377, italics added.) *McDonald* did not hold— and no case cited in the briefs on appeal or found through our independent research has held—that evidence of specific cases of

7

misidentification are absolutely admissible. Because it is commonly known that eyewitness identification can be mistaken (see, e.g., *United States v. Wade* (1967) 388 U.S. 218, 228, fn. omitted ["[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification"]), this is not a subject beyond the range of common experience of jurors, thus making evidence of specific cases of mistaken identification appropriate through an expert's testimony. What *McDonald* did hold is that, depending upon the propriety of expert testimony on eyewitness identifications in light of the facts and circumstances in a particular case, "'the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion.'" (*Ibid.*, fn. omitted; and see also *People v. Sanders* (1995) 11 Cal.4th 475, 508-509 (*Sanders*).)

Here, three reasons support the conclusion that the trial court did not abuse its discretion when it precluded Dr. Haber from testifying about specific cases in which eyewitness testimony at trial was shown post-trial to have been incorrect. First, there is no authority permitting the admission of such evidence. We are not inclined to issue a decision of first impression, finding such evidence should be admitted. This holds especially true given that the California Supreme Court has clearly stated that all jurors are aware of the fact that eyewitnesses make mistakes. Expert testimony on this subject would not assist the jurors because it is not beyond their common experience.

Second, evidence of a specific instance of mistaken identification by a witness in one case, standing alone, would have been irrelevant in tending to prove that the identifications in Parra's case were mistaken. It is the psychological factors affecting eyewitness identifications that are important in a given case, not what a witness did in a separate case. Essentially, Parra was attempting to prove the eyewitnesses in his case made mistaken identifications by presenting evidence that a different person made a mistaken identification in an unrelated case. However, the events that occurred in other cases is irrelevant to this case.

Third, even assuming the evidence is relevant, the trial court properly excluded evidence of specific other cases of mistaken identification under Evidence Code section 352. The court exhibited fundamentally sound reasoning in concluding that testimony about other specific cases in which a mistaken identification had occurred was inadmissible. The presence of psychological factors affecting eyewitness identifications are case specific. The admission of evidence showing the inaccuracy of eyewitness identification in an unrelated case would trigger the problem of litigating a case-within-a-case, including, for example, the need to show whether the conviction in the unrelated case was based solely on an identification by an eyewitness, whether the DNA was the exonerating factor, and whether the other case was similar or different from the case before the jurors. Any number of unique facts may contribute to the result of a trial, not just eyewitness identification. Although Parra's case does not involve the issue of presenting expert experimental evidence, he plainly was attempting to suggest a correlative relationship between other instances of misidentification and his defense of misidentification in his case. As such, it would appear that the admission of his evidence depended upon a foundational showing of substantial similarity of conditions, although not necessarily identical, between his case and another case of misidentification. (Cf. *People v. Turner* (1994) 8 Cal.4th 137, 198 [discussing experimental evidence].) Plainly, admission of mistaken identification in other unrelated cases raised a substantial threat for confusion of the issues, and consuming an undue amount of time.

We also reject Parra's claim that limiting Dr. Haber's testimony resulted in a denial of his due process right to present a defense. As a general rule, the application of ordinary rules of evidence does not infringe on a defendant's right to present at defense (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103), and it did not do so at Parra's trial. As noted above, Dr. Haber testified concerning factors that affect eyewitness identifications, and he testified that certain of those factors were present in Parra's case. Although a total exclusion of evidence offered to establish a defense may infringe a defendant's right to due process, the exclusion of evidence on a subsidiary point "does

9

not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)

Finally, even assuming the trial court erred in limiting the testimony of Parra's expert to the extent that it did, we find reversal is unwarranted under any standard of review. (See and compare *People v. Watson* (1956) 46 Cal.2d 818, 836 and *Chapman v. California* (1967) 386 U.S. 18, 26.) The court's ruling did not, as Parra maintains on appeal, deny him the right to present his chosen defense of eyewitness misidentification. Even without referring to any specific case where eyewitness identification was later demonstrated to have been wrong, the testimony from Parra's expert offered a strong discussion of the factors that affect the reliability of eyewitness identifications to the jury. In short, the eyewitnesses' identification of Parra as one of the three assailants was squarely contested by Dr. Haber's expert testimony, and by Parra's trial counsel during closing argument. Further, the trial court instructed the jury with CALCRIM No. 315, which highlighted numerous factors which the jury could consider in evaluating the reliability of the eyewitness's testimony. In *Sanders, supra*, the Supreme Court relied on such trial elements to exclude entirely a defense expert's testimony to have been harmless. (*Sanders, supra*, 11 Cal.4th at p. 510.) In light of the factors actually submitted to the jury, even if the trial court erred in limiting Parra's expert's testimony, we find the error was not prejudicial so as to warrant reversal. (*Ibid*.) We also note that the prosecution evidence in this case was strong, including not only Ms. S.'s identification, but also identification by Ms. G., who had prior contacts with Parra. We have no doubt that the outcome in Parra's case would have been the same had Dr. Haber discussed one or more specific cases involving an eyewitness misidentification.

## II.     Evidence of the Racial Animus Motive

Parra contends his murder conviction must be reversed because the trial court abused its discretion under Evidence Code section 352 (hereafter section 352) when it ruled that the victims in his prior robbery conviction and prior juvenile adjudication for assault were African American. Parra argues the so-called "racial animus" evidence should have been excluded as overly prejudicial. Further, he argues the use of the racial

10

animus evidence violated his constitutional due process right to a fair trial. We find no error, either of evidentiary or constitutional dimensions.

### *The Trial Setting*

After the defense expert finished testifying, defense counsel informed the court that Parra wanted to exercise his right to testify, and the court inquired whether there were evidentiary issues which needed to be addressed. The prosecutor advised the court that Parra had a prior conviction for robbery and a juvenile adjudication for assault, both of which he wanted to use to impeach Parra and to inform the jury that "the victims in both of those incidents were African American."

Parra's counsel agreed that the prosecution could use a prior robbery conviction for impeachment, but objected that the juvenile matter was "not a criminal conviction" and could not be used for impeachment. Further, counsel objected to admitting the fact that the victims in the prior crimes were African American as hearsay, stemming from police reports. Defense counsel argued the evidence was inadmissible under section 352 and that unless there were witnesses to testify that the victims were African American, the prosecutor should not be allowed to cross-examine the defendant on the topic. The prosecutor acknowledged that a juvenile adjudication was not a prior conviction, but maintained that he should be allowed to admit the adjudication because the victim was African American. Further, the prosecutor represented as to the juvenile assault that he "may have" located a witness to testify, but had not yet subpoenaed the witness.

At the end of these exchanges, the trial court ruled the prosecutor could impeach Para's credibility with the robbery, but not the assault. However, he further ruled that evidence that the victims of both crimes were African American was admissible for the purpose of showing racial animus. The court stated: "I find that the probative value is very strong as to showing racial animus in the [juvenile] assault, and there is no danger of undue prejudice or confusion of the issues. So the D.A. can ask your client about the robbery conviction."

11

On direct examination, Parra denied any involvement in the stabbing and murder of Johnson. He denied being a gang member, and denied ever admitting to any police officer that he belonged to a gang. He acknowledged he had multiple tattoos on his body, but said none of them were gang tattoos. He denied he committed the prior robbery for which he had been convicted, explaining that he had agreed to plead no contest to get the quickest deal so he could return home to his son. He denied knowing the race of the robbery victim. As for the juvenile assault matter, he explained that the victim was a "friend," and he "wouldn't say . . . was Black. He was Puerto Rican."

*Analysis*

On appeal, Parra concedes it is undisputed that his prior robbery conviction could be used for impeachment. (Citing *People v. Collins* (1986) 42 Cal.3d 378, 389 and similar cases.) He argues the trial court abused its discretion in admitting the fact that the victims in his prior robbery conviction and juvenile adjudication for assault were African American. He argues it is mere "coincidence" that the evidence in all three of his cases—the murder, robbery and assault—showed the victims of his crimes were African American, and asserts there was "no evidence of racial animus" in the cases which might justify use of evidence to show such animus in his crimes.

Although the challenged evidence was admitted as a result of Parra's decision to testify in his own defense, the issue here is not that of impeachment. Parra concedes the robbery conviction was admissible to impeach him and the trial court did not allow the jury to consider the evidence underlying the juvenile adjudication for impeachment. As correctly framed in the respondent's brief on appeal, the issue here is whether the trial court erred in admitting the evidence to show motive or modus operandi or plan. We believe this issue is properly framed as a section 352 dispute, and we find no error.

Under Evidence Code section 352, a trial court has discretion to admit or exclude relevant evidence upon weighing its probative value against the probability that admitting evidence which will unduly consume time, create a substantial danger of undue prejudice, or confuse the issues, or mislead of the jury. The weighing process under section 352 is a matter for the trial court's discretion depending upon the circumstances of each case, and

12

is not subject to the mechanical application of any automatic rules. (See, e.g., *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) A reviewing court may not disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd. (*Id.* at pp. 1314-1315.)

Prejudice in the weighing process of section 352 does not mean damaging to a party. (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.) Indeed, all evidence which tends to prove guilt is damaging to the defendant. Thus, prejudicial evidence within the meaning of section 352 refers to evidence that "'uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Here, the trial court did not abuse its discretion when it ruled that the prosecutor would be allowed to question Parra about the race of the victims in his prior cases. The issue of whether Parra harbored racial animus against African Americans was relevant to demonstrate his motive for the attack on Johnson. The evidence showed that Parra used racist language, and, in addition, the prosecution's gang expert testified that Parra's gang was biased against African Americans. Despite Parra's protestations on appeal that the victims were all just coincidentally black, in our review of the record we see more than sufficient evidence to support admissibility of the evidence to demonstrate racism as a motive for Parra's involvement in the stabbing and killing Johnson.

The record, when reviewed in accord with the usual standard of review on appeal, established that Parra, after the three-on-one attack on an unarmed victim, stated, "We don't like niggers in our hood. Stay the fuck out our hood." This was not, as Parra tells us on appeal, a case of a gang crime only, with a mere coincidental racial element. It was appropriate to admit the evidence that his other victims were African American to support the prosecution theory that racial animus was a motivating cause for the attack.

Finally, even assuming the evidence was admitted in error, it was harmless. Even without the racial animus evidence, substantial evidence supported Parra's conviction. Cecilia S. and Olga G. both identified Parra was one of the three attackers, and Olga G.

13

had seen Parra on prior occasions. Parra's testimony in his own defense, particularly his denial of any gang involvement at all, was weak. Thus, even without the challenged evidence, we see no probability that Parra would have obtained a more favorable result.

Our conclusion is the same under a due process, fair trial examination. The use of the racial animus evidence did not render Parra's trial fundamentally unfair. The People were still put to the task of persuading the jury beyond a reasonable doubt that Parra was one of the three assailants, and Parra was afforded an opportunity to challenge the eyewitness identifications. We do not find the racial animus evidence to have been overly inflammatory in light to other evidence which is not challenged—particularly Cecilia S.'s testimony— showing that the attack had a race-based motivation.

### III. Audience Conduct and the Right to a Fair Trial

Parra next contends his murder conviction must be reversed because his right to a fair trial under the federal and state constitutions was violated when a courtroom spectator wore a shirt supporting the victim. We disagree.

*The Trial Setting*

During a short recess after the prosecutor's opening argument, before the jurors were brought back into the courtroom for defense argument, Parra's counsel informed the court that an audience member had a shirt on which said 'In loving memory of Antwan Johnson,' and included his birth date. Counsel stated that the person had been walking around the courthouse and "was at the subway" while jurors were present. Counsel requested that the shirt be "covered up, removed, or something." The court asked the audience if there was someone wearing such a shirt, and an unidentified voice responded, "Probably me." The court noted there were a number of people with shirts with printing that appeared to be on the back. The court proposed the following to the lawyers: "I'll bring the jurors in and I'll ask if they have seen any shirts that relate in any way to this case. If they have, I'll tell them to ignore it. If they haven't, they haven't and we will just proceed with argument." The court then asked if there was "[a]nything else from the defense?" and Parra's counsel answered, "No." The court then questioned the jury as a whole whether any juror had seen anyone wearing a shirt related to the case. Two jurors

14

and two alternates indicated they had.  The court then questioned each of those jurors individually as to whether it concerned them, and each said no.  The court admonished the jury as a whole to "ignore the printing."

*Analysis*

Circumstances in a courtroom apart from the formal presentation of evidence can result in a violation of a criminal defendant's constitutional right to a fair trial when those circumstances create an "unacceptable risk . . . of impermissible factors coming into play" in the jury's decision-making processes.  (See, e.g., *Estelle v. Williams* (1976) 425 U.S. 501, 505 [reviewing the fairness of a trial where defendant was made to wear jailhouse rather than civilian clothes]; and *Holbrook v. Flynn* (1986) 475 U.S. 560, 567-572 [reviewing the fairness of a trial where defendants were specially guarded in the courtroom by state troopers].)  Where such circumstances are incurable by admonition, a mistrial may be appropriate.  (*People v. Lucero* (1988) 44 Cal.3d 1006, 1021-1022 (*Lucero*).

In *Lucero*, our Supreme Court found that the trial court's prompt admonition cured spectator misconduct that was much more egregious than that cited by Parra.  *Lucero* was a first degree murder case with two young girls as the victims.  During the closing argument of the defendant's counsel, the mother of one of the girls interrupted as counsel argued that the absence of evidence of screams or other sounds indicated the killings were not premeditated.  The mother cried out, "'There was screaming from the ball park. They couldn't hear the girls because there was screaming from the ball park.  That's why they couldn't hear it.  The girls were screaming—screaming from the ball park, screaming, screaming, screaming.  That wasn't in the case.  Screaming, screaming from the ball park.  Why wasn't that brought up?  Why?  why?  why?'"  (*Lucero, supra*, 44 Cal.3d at pp. 1021-1022, fn. omitted.)  The mother was escorted out of the courtroom, where she was attended to for several minutes, but her "screaming" could be heard from the corridor.  (*Id*. at p. 1022.)  After the outburst, the trial court directed the jurors to retire for deliberations with a admonition to disregard the outburst and denied the defendant's motion for a mistrial.  (*Ibid*.)

15

The defendant argued on appeal that the mother's outburst caused particularly serious prejudice because it came at the worst possible time, imparted facts outside the record, and occurred in a capital case. The Supreme Court, noting the limited nature of the outburst, the court's "prompt admonition," and its broad discretion in cases of spectator misconduct, found that the trial court acted properly in denying the defendant's motion for a mistrial. (*Lucero, supra*, 44 Cal.3d at pp. 1022-1024.)

Similarly, in *People v. Craig* (1978) 86 Cal.App.3d 905 (*Craig*), a defendant argued on appeal that his right to a fair trial was prejudiced by spectators who picketed outside the courthouse and by a spectator in the courtroom who made hand gestures during the testimony of a defense witness. (*Id*. at pp. 919-920.) The appellate court held that the trial court did not abuse its discretion when it denied defendant's motion for a mistrial because of the trial court's prompt admonitions. (*Ibid*.)

Here, while we agree that the "better practice" would have been for the trial court to order the spectators to remove the shirts or turn them inside out (see *People v. Houston* (2005) 130 Cal.App.4th 279, 320), we see no basis for believing that the jurors, when faced with the printing on a shirt, were unable or unwilling to base their verdict solely on the evidence presented during the trial. In fact, the jurors who stated that they had seen a shirt expressly told the court that it did not concern them. We see nothing in the record to support a conclusion that Parra did not receive a fair trial. (*People v. Lucero, supra*, 44 Cal.3d at pp. 1021-1022; *Craig, supra*, 86 Cal.App.3d at pp. 919-920.)

### DISPOSITION

The judgment is affirmed.


BIGELOW, P.J.

I concur:



FLIER, J.

16

*PEOPLE v. GUILLERMO PARRA* – **B258537**

Concurring – RUBIN, J.

I agree with the majority's conclusion that any errors in defendant's trial were not prejudicial and that the judgment is properly affirmed. I write separately only to record some disagreement with the analysis in "Part 1 – Scope of Expert Testimony" set out in the majority's Discussion section.

I agree that a trial court may properly exclude under Evidence Code section 352 expert witness testimony about, in the majority's words, "specific cases in which eyewitness testimony at trial was shown post-trial to have been incorrect." (Maj. Opn. at p. 8.) And I acknowledge that from the sidebar conference defense counsel was certainly intending to delve into that level of specificity. Nevertheless at least some of the questions defense counsel asked Dr. Haber did not ask for specific instances of misidentification. For example, the two questions quoted in the first two paragraphs of page 5 of the opinion are, in my view, generic questions about crime data that Dr. Haber had studied and other research dealing with post-conviction discovery of misidentification. The only objection to the two questions was "beyond the scope of [Dr. Haber's] expertise." Nothing in the majority opinion suggests that these questions were in fact beyond the scope of Dr. Haber's expertise. Dr. Haber was a psychologist with a Ph.D. from Stanford University. He had been engaged in research for 60 years and was an expert in eyewitness identification. He was well published.

There was significant discussion of the issue outside the presence of the jury but no discussion of Evidence Code section 352, which was one of the bases for the majority's conclusion that the evidence was inadmissible.

In addition to the two questions the majority quoted, after the jury returned to the courtroom, defense counsel asked Dr. Haber about a Sacramento study. Dr. Haber described the study without giving any specific case information. The trial court granted the People's motion to strike.

A review of Dr. Haber's testimony – both admitted and proffered – reveals much information about the studies themselves, what they generally purport to demonstrate, and the relevance to the issues presented in this case. While I agree that case specific information – e.g., testimony about a particular defendant who was convicted of armed robbery, a new trial was granted, and the defendant was exonerated after a second jury concluded there had been a misidentification – would not likely be relevant and could reasonably be excluded under Evidence Code 352, the court's ruling and the majority's opinion exclude far more than that. The extent of the exclusion, in my mind, is unwarranted, especially in the context of the Supreme Court's decision in *People v. McDonald (*1984) 37 Cal.3d 351, a case also cited in the majority. In *McDonald* the court wrote:

"In the dozen years since Judge Bazelon's appeal [in *United States v. Brown* (D.C. Cir. 1972) 461 F.2d 134, 145-146, fn. 1 (conc. & dis. opn.)], empirical studies of the psychological factors affecting eyewitness identification have proliferated, and reports of their results have appeared at an ever-accelerating pace in the professional literature of the behavioral and social sciences. No less than five treatises on the topic have recently been published, citing and discussing literally scores of studies on the pitfalls of such identification. (Eyewitness Testimony: Psychological Perspectives (Wells & Loftus edits. 1984) [hereinafter Eyewitness Testimony: Psychological Perspectives]; Evaluating Witness Evidence: Recent Psychological Research and New Perspectives (Lloyd-Bostock & Clifford edits. 1983); Sobel, Eyewitness Identification: Legal and Practical Problems (2d ed. 1983); Loftus, Eyewitness Testimony (1979); Yarmey, The Psychology of Eyewitness Testimony (1979); see also Johnson, *Cross-Racial Identification Errors in Criminal Cases* (1984) 69 Cornell L.Rev. 934 [hereinafter *Cross-Racial Identification Errors*]; Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification* (1977) 29 Stan. L.Rev. 969 [hereinafter *Expert Psychological Testimony*].) Indeed, in 1984 two leading researchers estimated that on this topic 'over 85[ percent] of the entire published literature has surfaced since 1978.'

2

(Wells & Loftus, *Eyewitness Research: Then and Now*, in Eyewitness Testimony: Psychological Perspectives, p. 3.) *The consistency of the results of these studies is impressive, and the courts can no longer remain oblivious to their implications for the administration of justice.*" (*Id.* at pp. 364-365; italics added.)

McDonald did not deal with the precise issue here – general studies of misidentification in criminal cases – and there is nothing in *McDonald* that suggests evidence of misidentifications in specific criminal cases is admissible. *McDonald* did hold that studies about factors that may contribute to misidentification is often admissible and, as *McDonald* itself held, exclusion of such evidence results in reversible error.

The evidence proffered here, in my view, comes within the scope of *McDonald.* The trial court's ruling was overly broad, and the excluded evidence contained what was properly admissible testimony about general studies in criminal cases. Nevertheless I agree with the majority that the error was harmless. Evidence about the potential unreliability of eyewitness testimony was admitted; the jury was instructed with CALCRIM No. 315; and the misidentification issue was forcefully litigated. And as the majority states, "the prosecution evidence in this case was strong including not only Ms. S.'s identification but also the identification by Ms. G who had prior contacts with [defendant]." (Maj. Opn at p. 11.) I too have no doubt that the result would not have been different if Dr. Haber had been permitted to testify in the manner I have described.


RUBIN, J.

3