Filed 11/10/25  P. v. Navarro CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

|  |  |
|---|---|
| THE PEOPLE, | C101122 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF99-0001946) |
| v. | |
| FRANCISCO ARELLANO NAVARRO, | |
| Defendant and Appellant. | |

In 1999, defendant Francisco Arellano Navarro killed his estranged wife, Blanca, and then fled to Mexico with their two children, where he evaded authorities for over 20 years.  In 2022, he was extradited to the United States and faced charges of first degree murder.  A jury convicted him as charged and also found the murder was premeditated and deliberate.

On appeal, Navarro admits he killed Blanca but argues there is insufficient evidence of premeditation and deliberation to support his conviction for first degree murder.  He also argues the trial court prejudicially erred in admitting evidence of domestic violence committed against a subsequent girlfriend pursuant to Evidence Code section 1109.  We disagree with both arguments and thus affirm.

1

## THE EVIDENCE AT TRIAL

Navarro and Blanca were married in 1995, and they had two children, a son and a daughter. The parties stipulated Navarro was convicted of misdemeanor domestic violence in 1997, and Navarro testified the conviction involved domestic violence against Blanca.

Navarro and Blanca separated sometime around June 1999. Blanca moved into her own apartment, and she and Navarro shared custody of the children. Shortly before Blanca's death, Navarro called Blanca's father and asked him to help get them back together. Blanca's father arranged for Blanca and Navarro to come to his house, and when they did, Navarro asked Blanca "to return to him and she said no," and "she did not want to be with [him] anymore." Shortly thereafter, Navarro called Blanca's father looking for Blanca because he wanted the children's birth certificates in order to register them for school. Blanca's father said he "didn't know anything about that."

A few weeks before her death, Blanca began dating A.R. On July 25, Blanca and A.R. spent the day shopping. They returned to Blanca's apartment later that afternoon, and A.R. ultimately went back to his house and said he would call her later. He tried calling several times later that evening, but Blanca did not answer. When he had not heard from her, he went back to Blanca's apartment at around 1:00 a.m. and found her lying dead on the floor of her bedroom. He called 911 and the police arrived shortly thereafter.

Blanca had been stabbed multiple times, a telephone cord was wrapped tightly around her neck four times, and a pair of white underwear was stuffed in her mouth. Police found a knife blade on the floor by her body. The parties stipulated Blanca died as a result of strangulation and multiple stab wounds. They also stipulated Navarro's DNA was found on the telephone cord and the knife handle (Blanca's DNA was found on the knife handle as well).

Police found a grocery bag on a table with a carton of milk and a carton of juice inside and an open container of ice cream on the counter. In the living room, police found a bowl of melted ice cream, plastic sandals, and the cover of a video tape for the movie Casper (Universal Pictures 1995). Police interviewed one neighbor who saw Navarro carrying grocery bags into Blanca's apartment that evening, and a second neighbor who saw Navarro carrying groceries and having a "heated conversation" with Blanca at the doorway of her apartment.

Navarro and Blanca's daughter (hereafter Daughter) testified about the night her mother was killed. She was seven at the time, and her brother was two. She testified she was at her mother's apartment, and she and her brother were watching the movie Casper in the living room. Someone knocked on the door and her mother answered it. It was her father. Her parents fought verbally, and her father pushed her mother into the bedroom. The bedroom door was closed, and she could hear yelling. Her father left the bedroom holding a blue portfolio, and Daughter later saw that it contained her birth certificate. Navarro then took the children outside, put them in his car, and told Daughter to take care of her brother and to not get out. As he was putting the children in the car, her mother came outside and her father pushed her mother to the ground. Both parents went back inside, and after a while her father came back outside alone, got into the car, and they left. They drove to Mexico, making a stop along the way to buy clothes and shoes for the children "because we didn't have shoes and we were in our pajamas." Daughter never saw her mother again.

Navarro's former romantic partner from his time living in Mexico, M.A., also testified at trial. She had lived in Mexico her entire life. She met Navarro sometime around 2002 and they had a daughter together. They lived together off and on for around 10 years, and she helped raise Navarro and Blanca's children.

Navarro initially told M.A. that Blanca had abandoned the children, but he later admitted he had killed her "because she was a whore." According to M.A., Navarro told

3

her, "he left the kids in one room watching TV and he closed himself up in the room with Blanca. They argued. [¶] There was like a knife for cutting fruit. And they started to have a really bad argument, and Blanca said that she was going to get him put back in jail. He got angry and he said he was going to harm her. And Blanca said he didn't have the balls to do that, and that was when he stabbed her with that knife."

M.A. also testified about other acts of domestic violence committed by Navarro. She testified she frequently left Navarro "[b]ecause he was really violent," but she would eventually "go back with him." She described him as "a possessive person." She stated he would beat her, choke her, call her a whore, and threaten to kill her if she "went with someone else." He would also threaten to take her daughter if she "went out with other people." When he hit her, he "would say that [she] was a whore just like Blanca." She testified, "He said that he was really jealous with his women and that he wouldn't be able to stand seeing me with anyone else, and if I wasn't his, then I couldn't be anyone's."

M.A. also testified about one specific incident that occurred after a birthday party. She and Navarro started to argue at the party, and they left with the children. On the way home, Navarro kicked her, pushed her, hit her, threw her to the ground, and picked up a rock and hit her with it. When Daughter tried to stop him, he kicked her and told her "she was just as much of a whore as her mom." M.A. thought this incident occurred in 2013 or 2014.

Daughter testified about this incident as well. She said Navarro hit M.A. with his fist and a rock. When she tried to stop him, he started "kicking" her and told her she "was a whore just like [her] mom." When they got home, Navarro told Daughter and her siblings to go inside and "he would do to her [i.e., M.A.] what he had done before" to Blanca. Daughter testified she was 18 or 19 when this incident occurred, which would have been approximately 2010 or 2011. On cross-examination, Daughter testified she did not tell police about this incident when they interviewed her in 2022, and on redirect examination, she testified police did not ask about this incident.

4

Navarro testified in his own defense. He testified he and Blanca separated in July 1999, and at some point, he learned she was leaving Daughter alone in the apartment while she was at work. He reported this to the police, and this caused problems in his relationship with Blanca.

On the day Blanca was killed, he dropped the children off at her apartment along with a bag of groceries. He told Blanca to give the children some ice cream because they had been asking for it on the way over. He also told her not to leave the children alone in the apartment, she told him to "drop that shit," and they started arguing. They moved to the bedroom, and Blanca said she was going to take the kids and move to Texas and Navarro would never see them again. She also said she was going to call the police and tell them he was mistreating and hitting her. Navarro then threatened to tell a former employer she had stolen things. Their argument got more heated. According to Navarro, Blanca came at him with a knife and stabbed his hand, and he took the knife away from her and began stabbing her. At some point he dropped the knife and Blanca tried to grab it, and he then grabbed a telephone cord, wrapped it around her neck, and "squeezed too hard." She dropped to the ground, and he grabbed a "rag that was close by" and shoved it in her mouth. When asked why, he responded, "I saw that maybe she was trying to speak or to scream. I don't know."

Navarro testified he was "momentarily paralyzed" and in shock, and "the only thing that occurred to me was to go to Mexico." He took the children's passports from a hall closet, left the apartment with the children, got in the car, and drove to Mexico. He testified that when he arrived at Blanca's apartment, he had no desire to hurt her or flee to Mexico.

The jury was instructed on first degree murder, second degree murder, voluntary manslaughter (both heat of passion and imperfect self-defense), and justifiable homicide/self-defense. It found him guilty of first degree murder, and specifically found the murder was committed with premeditation and deliberation.

5

## DISCUSSION

### I

### Sufficiency of the Evidence

Navarro argues the evidence was insufficient to support his conviction of first degree murder.  We disagree.

#### A.      *Standard of review*

A criminal defendant challenging a conviction for insufficient evidence bears a " ' "heavy burden." ' " (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1287.)  "To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict.  [Citation.]  [¶] The same standard governs in cases where the prosecution relies primarily on circumstantial evidence.  [Citation.]  We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]'  [Citation.]  'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible

6

of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

        B.      *The law of murder*

Murder is the unlawful killing of another with malice aforethought. (Pen. Code, § 187.) "The law recognizes two degrees of murder. The degrees are distinguished by the mental state with which the killing is done." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) As relevant in this case, first degree murder is an unlawful killing that is intentional, deliberate, and premeditated, and "[a]ll other kinds of murders are of the second degree." (Pen. Code, § 189, subds. (a), (b); see also *Gonzalez*, at p. 653.) "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." ' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Navarro relies heavily on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), in which our Supreme Court sought "to clarify the difference between the two degrees of murder" and to "set forth standards . . . for the kind of evidence which is sufficient to sustain a finding of premeditation and deliberation." (*Id*. at pp. 25, 26.) It identified three "types" or "categories" of evidence that it "has found sufficient to sustain a finding of premeditation and deliberation," namely, evidence of: (1) planning activity, (2) motive, and (3) manner of killing. (*Id*. at p. 26; see *id*. at p. 27.) It then explained,

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with either [planning] or [manner of killing]." (*Id*. at p. 27.)

Since *Anderson* was decided, our Supreme Court has cautioned numerous times that "[u]nreflective reliance" on it "is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517 (*Thomas*).) "[A]s we have often observed, '*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) Instead, it "was attempting to do no more than catalog common factors that had occurred in prior cases. The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) "*Anderson* does not require that [evidence of planning activity, motive, and manner of killing] be present in some special combination or that they be accorded a particular weight." (*People v. Pride* (1992) 3 Cal.4th 195, 247.) "Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

As the above demonstrates, the issue in this case is not whether the evidence is sufficient to show some special combination of planning, motive, and manner of killing. Instead, the issue is whether the evidence is sufficient to support the jury's finding of premeditation and deliberation. Nonetheless, because the parties have briefed this case through the lens of *Anderson*, we will analyze it that way as well.

8

C.    *Analysis*

Navarro argues the evidence was insufficient to support his conviction of first degree murder because there was (1) no evidence of planning, (2) weak evidence of motive, and (3) the manner of the killing was violent and impulsive rather than premeditated and deliberate. We find there is sufficient evidence to support the conviction.

Navarro first argues there was *no* evidence of planning. He notes the evidence shows he did not arrive at Blanca's apartment with the murder weapons (i.e., the knife and the phone cord), which suggests he "did not arrive with the intent to kill" her and the killing thus was not planned. He also notes he brought groceries for the children with him, and "[s]omeone intending to kill would not bring groceries for their children to eat at the victim's apartment." Premeditation and deliberation, however, can occur "in a brief period of time." (*People v. Perez, supra*, 2 Cal.4th at p. 1127.) While one way to prove premeditation and deliberation could include evidence from which a jury could infer that Navarro arrived at Blanca's apartment with the intent to kill her, that is not the only way to prove premeditation and deliberation. We are focused on whether the evidence supports a finding he formed the intent to kill her at *any time before he did so*. Particularly when viewed in this way, there is clear evidence of intent to kill prior to Navarro's act of killing.

Daughter testified that, on the night her mother was killed, she heard her parents yelling in the bedroom, her father then came out of the bedroom with a blue portfolio that contained her birth certificate, and he took the children outside, put them in the car, and told them to stay there. Her mother followed them outside, her father pushed her mother to the ground, and both parents then went back into the apartment. After a while, her father came back outside, got into the car, and they left. From this evidence, the jury could infer that Navarro decided to kill Blanca and flee to Mexico sometime between coming out of the bedroom and returning to the apartment after taking the children

9

outside to the car.  In order to act on his decision, he got the children's birth certificates so he could take them to Mexico, and he took them outside and put them in the car and told them to stay there so they would not be present when he killed their mother.  He then went back into the apartment to carry out his plan.

There was also some evidence from which the jury could infer that Navarro was planning on taking the children to Mexico days before he killed Blanca.  Blanca's father testified Navarro asked about the children's birth certificates shortly before the murder, and stated he needed them in order to register the children for school.  And Blanca's sister testified her son and Navarro's daughter both went to the same school, they had both just finished up the school year, and once a child was enrolled in the school, they did not need to provide a birth certificate for the next school year.  This evidence supports an inference Navarro was looking for the children's birth certificates because he was planning on taking them out of the country in the days before he killed Blanca, which also supports an inference he had formed a plan to kill her at that time.

M.A. testified Navarro told her he and Blanca "started to have a really bad argument, and Blanca said that she was going to get him put back in jail.  *He got angry and he said he was going to harm her.*  And Blanca said he didn't have the balls to do that, *and that was when he stabbed her* with that knife." (Italics added.)  From this, the jury could infer that Navarro decided to kill Blanca when she said she was going to get him put in jail, and he then rapidly, but deliberately, acted on that decision and killed her. "[A] murder is of the first degree regardless of how quickly the act of killing follows the ultimate formation of the intention if that intention has been reached with deliberation and premeditation." (*People v. Perrotta* (1964) 224 Cal.App.2d 498, 504.)

Navarro's own testimony supports an inference he killed Blanca with premeditation and deliberation.  He testified that during the argument with Blanca, she told him she was going to take the children away from him and move to Texas and he would never see them again.  He told her he would not permit that, and Blanca then said

10

she was going to call the police on him and accuse him of hitting her. It would not be unreasonable for the jury to infer that this exchange prompted Navarro to decide to kill Blanca. Navarro testified that it was immediately after this exchange that Blanca came at him with a knife, which resulted in Navarro gaining access to the knife and stabbing her with it.

Moreover, Navarro did not stop at simply stabbing Blanca. As Navarro himself testified, as he was stabbing Blanca, she tried to defend herself and she was able to get away from him and he dropped the knife. As Blanca lunged toward the knife, Navarro grabbed a telephone cord and wrapped it around her neck. He testified that he "squeezed too hard" and Blanca dropped to the ground. Navarro let go of the cable and he grabbed a rag that was close by and shoved it into her mouth. It would not be unreasonable for the jury to infer that Navarro had time to reflect in between stabbing Blanca and deciding to strangle her with a telephone cord. Again, " 'There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as successive thoughts of the mind.' " (*People v. Thomas* (1945) 25 Cal.2d 880, 900.) "The true test is not the duration of time as much as it is the extent of the reflection." (*Ibid.*)

There was also evidence of motive, as Navarro himself acknowledges. M.A. testified Navarro threatened to kill her if she went out with anyone else and told her, "he was really jealous with his women and . . . wouldn't be able to stand seeing [her] with anyone else, and if [she] wasn't his, then [she] couldn't be anyone's." She also testified that, when Navarro would hit her, he would say she was "a whore just like Blanca." The evidence also showed that, shortly before Blanca's death, Navarro tried to get back together with her but she rebuffed him, and she had also recently started dating someone else. This evidence is sufficient to support an inference that Navarro killed Blanca because she refused to get back together with him; she had started dating someone else, which made her "a whore" in Navarro's mind; and "if [she] wasn't his, then [she] couldn't be anyone's."

11

Finally, despite Navarro's attempt to persuade us otherwise, we conclude that the manner of killing supports a finding of premeditation. (See *Thomas, supra*, 2 Cal.4th at p. 518 ["manner of the killing[]" can "strongly suggest[] premeditation"]; *People v. Memro* (1995) 11 Cal.4th 786, 863-864 [notwithstanding *Anderson*, "the method of killing alone can sometimes support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder"].) The parties stipulated Blanca died from *both* multiple stab wounds *and* strangulation. "A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation." (*People v. Pride, supra*, 3 Cal.4th at p. 247.) Moreover, Navarro testified he strangled Blanca *after* he stabbed her multiple times, and the parties stipulated the telephone cord he strangled her with was wrapped around her neck four times. As noted above, Navarro thus had time to reflect between stabbing Blanca and wrapping a telephone cord around her neck not once, but four times. " 'Ligature strangulation is in its nature a deliberate act.' [Citation.] This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act. 'A rational finder of fact could infer that [this manner of killing] demonstrated a deliberate plan to kill her.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020.) "While ligature strangulation may not always evidence a premeditated murder [citation], the jury could have viewed the strangulation as a deliberate manner of killing sufficient to indicate a 'preconceived design.' " (*People v. Lucero* (1988) 44 Cal.3d 1006, 1020.) Finally, there was also evidence Navarro stuffed a pair of underwear in Blanca's mouth, which could support an inference she was screaming and he was trying to ensure no one heard her, which could, in turn, support an inference of premeditation and deliberation.

Navarro argues the manner of the killing "supports a finding that the murder was done in a rash impulse of rage, and not a calculated or deliberate manner." To quote another case, "The jury *could* have reasonably found that the victim's injuries reflected an

emotional, berserk attack, as suggested by defendant's briefing.  But it was permitted to find otherwise." (*People v. Williams* (2018) 23 Cal.App.5th 396, 410.)  Moreover, "The actual murder need not be committed in a clinical, or dispassionate manner in order for it to be first degree." (*People v. Martinez* (1987) 193 Cal.App.3d 364, 373.)

As the above demonstrates, there is evidence in this case of planning activity and reflection, motive, and facts about the nature of the killing from which the jury could infer it was premeditated and deliberate.  (See *Anderson, supra*, 70 Cal.2d at p. 27 ["this court sustains verdicts of first degree murder typically when there is evidence of all three types"].)  We are satisfied the evidence was sufficient to support the verdict of first degree murder.

## II

### Testimony Admitted Pursuant to Evidence Code Section 1109

Navarro argues the trial court erred in allowing M.A. and Daughter to testify about other acts of domestic violence pursuant to Evidence Code section 1109,[1] and this error requires reversal.  We disagree.[2]

A.      *Relevant law and standard of review*

Pursuant to section 1101, "Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to

---

[1]      Undesignated statutory references are to the Evidence Code.

[2]      For the same reasons Navarro argues the trial court erred in admitting this evidence pursuant to section 1109, he also argues the admission of this evidence violated his right to due process by rendering the trial fundamentally unfair.  "Courts have consistently rejected [the] claim . . . that the admission of propensity evidence under section 1109 violates due process." (*People v. Merchant* (2019) 40 Cal.App.5th 1179, 1194; see also *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14 (*Brown*) [noting numerous courts have held "the admission of evidence pursuant to section 1109 . . . does not violate a defendant's rights to due process"].)  We agree and thus reject his due process claim for the same reasons we reject his claim that the evidence should not have been admitted pursuant to section 1109.

13

prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) There are, however, important exceptions to this rule in cases involving sexual offenses and domestic violence. (*Ibid.*) As relevant here, section 1109, subdivision (a)(1), provides, "Except as provided in subdivision (e) . . . , in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Section 1109 thus "permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes." (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.)

As noted, section 1109 provides evidence of other acts of domestic violence is admissible "if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a).) "By its incorporation of section 352, section 1109, subdivision (a)(1) makes evidence of past domestic violence inadmissible only if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*).)

Section 1109 recognizes a distinction based on the length of time between the current offense and the other acts of domestic violence. Section 1109, subdivision (e) provides, "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." "Thus, while evidence of past domestic violence is presumptively admissible under subdivision (a)(1), subdivision (e) establishes the opposite presumption with respect to acts more than 10 years past." (*Johnson, supra*, 185 Cal.App.4th at p. 537, fn. omitted.) Subdivision (e) does not prohibit evidence of such remote acts. Indeed, "It clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an 'interest of justice' standard." (*Johnson*, at p. 539.) The inquiry under subdivision (e) is similar to

14

the inquiry under section 352, and "the 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was 'more probative than prejudicial.' " (*Johnson*, at pp. 539-540.)

We review a challenge to a trial court's decision to admit evidence pursuant to section 1109 for an abuse of discretion. (*Johnson, supra*, 185 Cal.App.4th at p. 539.) Under the abuse of discretion standard, "The burden is on defendant to show the trial court's decision was irrational or arbitrary." (*People v. Medina* (2018) 24 Cal.App.5th 61, 65.)

### B.    *Additional relevant facts*

Prior to trial, the parties filed competing motions in limine regarding whether M.A. and Daughter would be permitted to testify about other incidents of domestic violence. At the hearing on the motions, the People stated they anticipated M.A. would testify Navarro was physically violent throughout their relationship and threatened to kill her like he killed Blanca, and M.A. and Daughter would both testify about a specific incident that occurred sometime between approximately 2011 and 2014 when Navarro assaulted M.A. as they walked home from a party and he kicked Daughter when she tried to stop him. The People argued such evidence was admissible pursuant to section 1109. Navarro argued all such evidence should be excluded pursuant to section 352 because it was more prejudicial than probative. He also argued that evidence about the incident following the party should be excluded because it occurred more than 10 years after the charged offense.

The trial court ruled M.A. would be permitted to testify about domestic violence occurring throughout their relationship, and M.A. and Daughter would be permitted to testify about the specific incident following the birthday party. It noted the evidence was admissible pursuant to section 1109, subject to section 352 and the 10-year time limit in section 1109, subdivision (e). It noted the evidence would "involve substantially less

15

egregious conduct" than murder. It found the evidence was similar to the charged offense in that, although murder is "more serious and egregious behavior," both were "clearly domestic violence-related acts" and thus "of a similar nature." It found the evidence had "another layer of probative value in this case," because it was anticipated M.A. would testify Navarro would make "specific admissions" about Blanca's murder while he was physically abusing her, "[t]hose admissions are clearly admissible,"[3] and the fact that Navarro admitted he killed Blanca while he committed other acts of domestic violence against M.A. gave this evidence "even . . . higher probative value." The court concluded the probative value of the evidence was "extremely high" and it was "not outweighed by the risk of undue prejudice or the other issues under 352 of the Evidence Code."

The court then addressed the admissibility of evidence regard the one incident that occurred more than 10 years after Blanca's killing. It noted the domestic violence involving M.A. occurred "in a continuous fashion" that extended "beyond ten years," and it found this continuous course of conduct, "coupled with the fact that . . . the defendant allegedly made admissions during the course of these instances, raises their probative value in the Court's mind. And makes it in the interest of justice to allow that evidence and testimony in."

Finally, the court stressed that if the evidence introduced at trial "brings the timeframes substantially out of . . . compliance with what the Court anticipates here, I'm going to entertain further objections. . . . That would be both evidence that the alleged events occurred substantially beyond that 13-year window that I'm anticipating today or a

---

[3]    Both in the trial court and here, Navarro makes it clear he does *not* challenge the admissibility of those "specific admissions" (i.e., he does not challenge M.A.'s testimony that Navarro told her he killed Blanca), and we note they are admissible pursuant to section 1220, which provides, "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party."

16

substantial break in the alleged instances. Either one, I think, would cause the Court to consider whether the interest of justice required a different analysis."

M.A. and Daughter testified as described above (see *supra*, pp. 4-5), and no further objections were made as to the admissibility of their testimony under section 1109.[4]

C.    *Analysis*

Navarro makes two separate arguments about the challenged evidence: (1) *all* evidence regarding other acts of domestic violence should have been excluded pursuant to section 352 because it was substantially more prejudicial than probative; and (2) evidence about the incident that occurred after the family party should have been excluded pursuant to subdivision (e) of section 1109 because it occurred more than 10 years after Blanca's killing. We disagree with both arguments.

We first discuss what we will refer to as general evidence of domestic violence (i.e., M.A.'s testimony about Navarro's physical abuse throughout their relationship, but not including the one specific incident that occurred more than 10 years after Blanca's killing), and we then discuss evidence regarding that one specific incident.

1.    General evidence of domestic violence

We begin by reiterating that evidence of domestic violence occurring within 10 years of the charged offense is "presumptively admissible under subdivision (a)(1)" of section 1109 unless the court concludes "its probative value is 'substantially outweighed' by its prejudicial impact." (*Johnson, supra*, 185 Cal.App.4th at pp. 537, 531.) Here, the trial court found the probative value of the evidence was not substantially outweighed by its prejudicial impact, and Navarro fails to demonstrate that decision was irrational, arbitrary, or otherwise an abuse of discretion.

---

[4]    Navarro objected on other grounds (i.e., leading, nonresponsive, vague), but not on grounds related to section 1109.

The trial court found the probative value of the challenged evidence was "extremely high," and we agree. "[T]he legislative history of [section 1109] recognizes the special nature of domestic violence crime, as follows: 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' " (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.) Section 1109 "reflects the legislative judgment that in domestic violence cases, as in sex crime cases, similar prior offenses are *'uniquely probative' of guilt* in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence. [Citations.] This pattern suggests a psychological dynamic not necessarily involved in other types of crimes." (*Johnson, supra*, 185 Cal.App.4th at p. 532, italics added, fn. omitted.) We thus start with the presumption that because Navarro was charged with an offense involving domestic violence, evidence of other acts of domestic violence is uniquely probative of his guilt.

Moreover, we agree with the trial court that the probative value of the evidence in this case was "extremely high" because M.A. testified Navarro would physically abuse her while threatening to kill her and telling her he killed Blanca. As the trial court found,

18

the coupling of (1) abuse of M.A. with (2) admissions of killing Blanca gave the evidence "another layer of probative value."

Navarro argues M.A.'s testimony about domestic violence was "not similar" to the charged offense and thus not probative. We disagree. It is true, as Navarro argues, that " '[t]he principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.) M.A. testified Navarro regularly beat her and threatened to kill her if she went out with someone else, and Navarro argues this is "vastly dissimilar" from stabbing Blanca with a knife and strangling her with a telephone cord. Not so. As the trial court properly found, "As far as the similarity of the acts, . . . first degree premediated murder [is] certainly . . . more serious and egregious behavior. But they are both . . . clearly domestic violence-related acts. . . . They both clearly fall within the classic definition of domestic violence. So even though the severity is substantially different, the acts themselves are of a similar nature." We agree.

As used in section 1109, domestic violence means "abuse committed against . . . a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating . . . relationship." (Pen. Code, § 13700, subd. (b); see also Evid. Code, § 1109, subd. (d)(3).) Navarro was charged with murdering Blanca, who was his spouse, and "murder is 'the ultimate form of domestic violence.' " (*Brown, supra*, 192 Cal.App.4th at p. 1237.) And M.A. testified he physically abused her, and she was a cohabitant and someone with whom he had a child and a dating relationship. Navarro was thus "accused of an offense involving domestic violence"; M.A. testified about "defendant's commission of other domestic violence"; and M.A.'s testimony was thus presumptively admissible under section 1109. (§ 1109, subd. (a)(1).)

The fact that Navarro stopped short of killing M.A. does not make her testimony any less probative. The trial court thus did not abuse its discretion in finding the

19

challenged evidence about domestic violence was sufficiently similar to the charged offense to be admissible pursuant to section 1109.  We also note the trial court properly found the other acts of domestic violence were less inflammatory than the charged conduct, which also *lessened* the prejudicial impact of that evidence.  (See *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119 [court may consider "whether the prior acts of domestic violence were more inflammatory than the charged conduct" when assessing prejudice].)

Given the high probative value of the section 1109 evidence in this case, Navarro bears a heavy burden of convincing us it was nonetheless substantially outweighed by its prejudicial impact and the trial court acted arbitrarily or capriciously when it concluded otherwise.  He fails to meet his burden.

Navarro argues generally that the evidence was unduly prejudicial.  We disagree. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.  '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is "prejudicial."  The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638, italics added.)  Here, the Legislature has already determined that evidence of other domestic violence is " 'uniquely probative' " in a criminal action in which the defendant is accused of an offense involving domestic violence.  (*Johnson, supra*, 185 Cal.App.4th at p. 532.)  Thus, even though the challenged evidence may have been damaging to Navarro's case, it was not prejudicial within the meaning of Evidence Code section 352 because it was highly relevant.  (See *People v. Johnson, supra*, 77 Cal.App.4th at p. 420 ["the California Legislature has determined the policy

considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence"].)

Navarro makes two arguments about the prejudicial impact of the evidence that we find forfeited because he failed to object below. He argues "much of [M.A.]'s testimony was not regarding domestic violence," but was "simply evidence of a bad character," and it was thus inadmissible pursuant to section 1101 (i.e., because it was generic evidence of bad character), and was not made admissible by section 1109 (i.e., because it was not evidence of domestic violence). The only example he gives is M.A.'s brief testimony that he was "a womanizer" and "possessive." That testimony was as follows. On direct examination, M.A. testified she and Navarro "lived together and then we would separate and then I'd go back to him and then we would separate again." She was asked whether Navarro ever moved back in with her "without you inviting him to move in," and she responded, "Yes." The following exchange then occurred:

"Q: Can you explain that to me?

"A: One of the many times was because he was violent, and he was also *a womanizer*.

"Q: Okay. So how did he come to move back in with you if you didn't invite him?

"A: Because he's *a possessive person*." (Italics added.)

Navarro did not object that the testimony was inadmissible under section 1101, or that it fell outside the evidence the court ruled was admissible pursuant to section 1109, or that it was otherwise objectionable on any grounds, and "the failure to raise a timely objection forfeits the claim for appeal." (*People v. Booker* (2011) 51 Cal.4th 141, 170.) It is true that "a sufficiently definite and express ruling on a motion in limine may also serve to preserve a claim" for appeal, but the trial court ruled that M.A. would be permitted to testify about other acts of domestic violence, not that she would be permitted

21

to testify about Navarro's bad character in general. (*People v. Brown* (2003) 31 Cal.4th 518, 547.) In order to argue on appeal that M.A. should not have been permitted to testify about his bad character in general, he needed to object *on that same ground* in the trial court. (*People v. Raley* (1992) 2 Cal.4th 870, 892 ["It is 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal' "].) He failed to do so.

In any event, we find M.A.'s testimony that Navarro was possessive was inextricably bound up with her testimony about his acts of domestic violence because she testified that while he was physically abusing her, he would threaten to kill her if she "went with someone else," and he told her "that he was really jealous with his women and that he wouldn't be able to stand seeing [her] with anyone else, and if [she] wasn't his, then [she] couldn't be anyone's." We thus disagree with Navarro's contention that M.A.'s testimony he was possessive was simply generic "bad character" evidence. Instead, we find it was part and parcel of the domestic violence described by M.A.

Navarro also complains that M.A. testified he raped her, but we find he waived any argument regarding the admission of that testimony. M.A. testified on direct examination that Navarro "would rape me." No objection was made. On cross-examination, defense counsel asked whether she testified during the preliminary hearing that Navarro would rape her, and she responded, "I don't remember." That is the extent of her testimony regarding rape.

After M.A. testified, and outside the presence of the jury, the trial court stated it "did not anticipate" M.A. would testify Navarro raped her, and it was "concerned about the prejudicial effect" of that testimony. The trial court noted, "There was no objection at the time from the defense. So the Court did not interrupt the evidence presentation. And [defense counsel] did use . . . that testimony as impeachment or attacking the credibility of the witness" by "cross-examin[ing] her regarding her lack of presentation of that

22

evidence and testimony at the preliminary hearing." The court then asked defense counsel whether he "wishe[d] to leave that evidence alone" or "object to" it, and if he objected, the court stated it would "conduct another hearing outside the presence of the jury so the Court can engage in the 352 balancing and decide whether that evidence will, in fact, remain in the record. If it is going to be stricken, of course, I would do that in front of the jury, along with the appropriate limiting instruction." Defense counsel stated he wanted to consider how to proceed, "But right now, I'm thinking I probably will have the Court do nothing because I think I did successfully show to the jury that that was a new revelation and inconsistent with her prior statements to law enforcement, and more particularly, at the preliminary hearing. So I think it's something that I may want to argue to the jury regarding her believability." The trial court revisited the issue the next day, and defense counsel stated he would "just as soon the Court not rehighlight that. *So I'm asking the Court to do nothing*." (Italics added.) Having affirmatively decided not to object to M.A.'s brief testimony that he raped her, Navarro cannot now be heard to complain that this testimony was unduly prejudicial.

Navarro also argues M.A.'s testimony was "impermissibly inflammatory" because it "invite[d] the jury to speculate that [he] was a jealous womanizer who regularly beat and raped [Blanca] even though there was no evidence of this." We have already determined Navarro cannot complain about M.A.'s testimony that he raped her because he made an affirmative decision not to challenge that testimony. In any event, we find nothing in M.A.'s testimony that might lead the jury to speculate he regularly beat and raped Blanca (and we note the prosecutor said nothing during closing argument that might invite such speculation). We also note (1) the parties stipulated Navarro was convicted of misdemeanor domestic violence in 1997, (2) he testified the conviction involved Blanca, and (3) the jury was properly instructed domestic violence means "abuse," which, in turn, means "intentionally or recklessly causing or attempting to cause

23

bodily injury." There was thus evidence Navarro had either physically injured Blanca in the past or attempted to do so.

Relatedly, Navarro argues the evidence about other acts of domestic violence was likely to confuse the jury and tempt it to punish him for abusing M.A. We disagree because the jury was instructed as follows:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically: . . . domestic violence acts against [M.A.]. [¶] · · · [¶]

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. . . .

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may consider that evidence and weigh it together with all the other evidence received during the trial to help you determine whether the defendant committed murder. Remember, however, that evidence of uncharged domestic violence is not sufficient alone to find the defendant guilty of murder. The People must still prove the charge and allegation of willful, deliberate, and premeditated murder beyond a reasonable doubt."

Given these instructions, and our presumption "a jury understands and follows the court's instructions," we are satisfied the evidence did not confuse the jury. (*People v. Cortes* (2022) 75 Cal.App.5th 198, 205.)

Finally, Navarro argues the other domestic violence was too remote. He complains that M.A. testified about "domestic violence incidents which occurred three to thirteen years *after* the charged conduct." It is unclear precisely what his complaint is. Because he emphasizes the word *after*, it is possible he contends section 1109 only applies to domestic violence that occurred *before* the charged conduct. If so, we disagree.

24

Section 1109, subdivision (a)(1) refers to "evidence of the defendant's commission of other domestic violence," without including any temporal modifier. In *People v. Medina* (2003) 114 Cal.App.4th 897, the court interpreted a similar provision in section 1108, which governs the admissibility of other sex offenses, and held, "The plain language of Evidence Code section 1108 does not limit evidence of uncharged sexual offenses to those committed *prior* to the charged offense. On the contrary, the statute broadly states that evidence of the 'defendant's commission of *another* sexual offense,' is not made inadmissible by the prohibition on the introduction of character evidence contained in Evidence Code section 1101. (Evid. Code, § 1108, subd. (a), italics added.) This language strongly suggests that evidence of an uncharged sexual offense committed after the charged offense is within the scope of section 1108." (*Medina*, at p. 902.) The trial court found the same analysis applied to section 1109, and we agree.

We disagree with Navarro's remoteness argument for another reason. As noted above, under section 1109, evidence of domestic violence that occurred within 10 years of the charged conduct is presumptively admissible. (*Johnson, supra*, 185 Cal.App.4th at p. 537.) Blanca was killed in 1999, and M.A. testified Navarro was violent throughout their relationship, which lasted from around 2002 to 2012. Thus, much (if not most) of M.A.'s testimony was about domestic violence that occurred within 10 years of the charged conduct, which means it was presumptively admissible. Navarro states, "It was impossible to tease out which of [M.A.]'s allegations regarding domestic violence occurred within the ten years, but a significant amount apparently took place outside that time period." The only evidence he cites to support his assertion that a "significant amount" of domestic violence "took place outside that time period" is her testimony that "there would be hitting" "fairly regularly" "in the latter dates." Based on M.A.'s testimony as a whole rather than focusing on one isolated snippet, we are satisfied she described a continuous and fairly unbroken pattern of domestic violence, which began

25

well before 2009 (i.e., within 10 years of Blanca's killing) and continued throughout their relationship.

Based on all of the above, Navarro fails to convince us that the trial court abused its discretion in concluding M.A.'s testimony about general domestic violence was admissible pursuant to section 1109, and its probative value was not substantially outweighed by its prejudicial impact.

2.      Evidence of the specific incident following the party

That leaves M.A.'s and Daughter's testimony about the incident after the family party. The precise date of this incident is unclear, but M.A. and Daughter testified it occurred between 2010 to 2014, which is more than 10 years after Blanca was killed. The trial court found it was in the interest of justice to admit evidence of this incident because M.A. testified to a continuous course of abuse and also testified Navarro admitted he killed Blanca during the abuse, which raised the probative value of the evidence. To this we would add the evidence was highly probative because M.A. and Daughter testified similarly and thus corroborated each other, both women testified that when Daughter tried to stop Navarro from hitting M.A., he kicked her and said she was "a whore just like [her] mom" (which is relevant to motive, as discussed above), and Daughter testified he said he would do to M.A. what he did to Blanca (which the jury could infer was an admission he killed Blanca).

As noted above, under subdivision (e) of section 1109, this evidence was inadmissible unless the trial court determined its admission was in "the 'interest of justice,' " because it was " 'more probative than prejudicial.' " (*Johnson, supra*, 185 Cal.App.4th at pp. 539-540.) The trial court found it was in the interest of justice to admit this evidence, and Navarro fails to convince us the trial court abused its discretion in so finding.

26

**DISPOSITION**

The judgment is affirmed.

_____/s/_____
EARL, P. J.


We concur:


_____/s/_____
KRAUSE, J.


_____/s/_____
WISEMAN, J.*

_____

27